# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PITTSBURG SNF LLC, BALCH SPRINGS SNF LLC, BAY OAKS SNF LLC, BELLMIRE SNF LLC, BENBROOK SNF LLC, BIRMINGHAM SNF LLC, BLUEBONNET SNF LLC, CLARKSVILLE SNF LLC, CLYDE SNF LLC, COLONIAL MANOR SNF LLC, COLONIAL MANOR NH SNF LLC, COURTYARD SNF LLC, CROWELL SNF LLC, EL PASO SNF LLC, GARDENDALE SNF LLC, GREENVILLE SNF LLC, HENDERSON SNF LLC, LUBBOCK NH SNF LLC, MCALLEN SNF LLC, MESQUITE NH SNF LLC, MONTERREY SNF LLC, MUNDAY SNF LLC, PALO PINTO SNF LLC, PARK VIEW SNF LLC, PRAIRIE HOUSE SNF LLC, RIVER OAKS SNF LLC, ROSENBERG SNF LLC, SANTE FE SNF LLC, SOUTHEAST SNF LLC, STONEBROOK MANOR SNF LLC, SULPHUR SPRINGS SNF LLC, PINECREST SNF LLC, RENAISSANCE SNF LLC, VERNON SNF LLC, VISTA HILLS SNF LLC, WEDGEWOOD SNF LLC and WHITE SETTLEMENT SNF LLC<br><br>Plaintiffs,<br><br>v.<br><br>PHARMERICA EAST, INC., as successor in interest to PHARMASTER, L.P.,<br><br>Defendant/Third-Party Plaintiff,<br><br>v.<br><br>PHARMASTER, L.P., PHARMASTER GP, LLC, PETER LICARI, MICHAEL D'ARCANGELO, WILLIAM D. JACOBSON, and DAVID C. MILLING,<br><br>Third-Party Defendants. | CIVIL ACTION NO. 2:10-CV-363 |

STATEMENT OF EXPERT OPINIONS AND EXPERT REPORT
OF KEVIN MCANANEY

This is my expert report on the work that I have done to date in the course of my engagement as an expert witness for Pittsburgh SNF LLC and the other plaintiffs (collectively, "Pittsburgh SNFs") in the above-referenced proceeding. I have been asked to provide my analysis and assessment of certain business arrangements between the former owners of the Pittsburgh SNFs and PharMerica East, LLC ("PharMerica") relating to the purchase by PharMerica of PharMaster LP ("PharMaster").

Specifically, I have been asked whether the contractual arrangements between PharMerica and PharMaster (including the underlying circumstances relating to how these arrangements were made and/or formed) were structured consistent with the custom and practice in the health care industry to comply with the federal health care program anti-kickback statute, 42 U.S.C. § 1320a-7b(b). In particular, I have been asked whether the contractual arrangements are usual and customary in the healthcare industry and, more specifically, whether those arrangements were violative of the anti-kickback statute.

I.   BACKGROUND AND QUALIFICATIONS

I specialize in federal health care fraud and abuse laws and have over 25 years of experience in health law, including substantial experience working in and with the federal government on the regulatory framework upon which I am opining.

I was the Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General of the United States Department of Health and Human Services ("HHS") from 1997 until 2003. In that position, I was responsible for issuing formal guidance to the regulated community through advisory opinions, fraud alerts and special bulletins, compliance program guidance, and regulations related to the fraud and abuse statutes and regulations enforced by the Office of Inspector General ("OIG"), including the anti-kickback statute, 42 U.S.C. § 1320a-7(b) and the physician self-referral law, 42 U.S.C. § 1395nn (commonly known as the "Stark law"). In that position, I also was a principal author of the 1999 anti-kickback statute "safe harbor" rulemaking, 64 Fed. Reg. 63518 (November 19, 1999).

I also was the principal author of the Stark Phase I and Phase II rulemakings, 66 Fed. Reg. 856 (January 4, 2001); 69 Fed. Reg. 16054 (March 26, 2004). In addition, I worked closely with the United States Department of Justice ("DOJ") in developing cases involving the anti-kickback statute and Stark law, including the use of such claims as predicates for False Claims Act litigation.

Since May 2003, I have specialized my legal practice on the regulation of Medicare fraud and abuse. I have been retained by the Centers for Medicare and Medicaid, the Office of the Assistant Secretary for Planning and Development in HHS, and the Medicare Payment Advisory Commission, an independent Congressional agency for my expertise in the federal health care fraud law and regulation. I regularly counsel health care entities on the Stark and anti-kickback statute and regulations, including

2

how to structure arrangements to comply with those laws. In particular, I have counseled clients on compliance issues related to contractual arrangements and joint ventures.

Prior to joining the Office of Inspector General ("OIG"), I practiced health and regulatory law with the law firm of Dewey Ballantine for 13 years, including ten years as a partner.

I also served from 1981 to 1983 as Assistant Counsel to New York Governor Hugh Carey with principal responsibility for legislation and litigation affecting the health and human services agencies, including the Medicaid program, and from 1980 to 1981 as the Director of Legal Affairs for the New York Hospital.

I am currently an adjunct professor at the University of Maryland Law School, a member of the Advisory Board for the Bureau of National Affairs' Health Care Fraud Reporter, and a frequent speaker on health care fraud issues. I am a past member of the Board of Directors of the American Health Lawyers Association.

I have been qualified at trial as an expert on the reasonableness of interpretation of the anti-kickback statute. The matters in which I have given deposition or trial testimony as an expert witness in the last four years are set forth in Appendix A to this report.

I am being compensated for my time at a rate of $500 per hour for my services in preparing this report.

I have reviewed certain documents that counsel for the Pittsburgh SNFs provided me, as specifically set forth in Appendix B to this report, and I have been provided access to what I understand to be the complete production by all parties to this matter. I have also undertaken independent investigation regarding certain regulatory issues involving PharMerica (or its parent/affiliate), as outlined below. I have also reviewed the relevant statutes, regulations, preambles, and government guidance related to the anti-kickback statute law. This report is based on my experience and knowledge of the custom and practice of regulators and the health care industry with respect to compliance with the federal anti-kickback statute, as well as my knowledge of the federal agency issued guidance including OIG advisory opinions, other OIG issued guidance, and the statutory, regulatory and case law to date.

I reserve the right to modify or amend the report based on further discovery in the litigation. I also reserve the right to provide any rebuttal opinions in response to any witness and/or expert opinions provided by PharMerica and/or Third-Party Defendants in connection with this matter.

I.   BACKGROUND

   A.   Summary of Transaction

Based upon my review of the documents provided, it is my understanding that, in late 2005/early 2006, the prior owners of the Pittsburg SNFs (namely, Peter Licari and Michael D'Archangelo), ventured to create a captive pharmacy that would serve to provide pharmaceutical goods and services to the Pittsburg SNFs (at least 35 of them, excluding Munday and Crowell). As a result, Messrs. Licari and D'Arcangelo formed PharMaster, LP. On or about January 25, 2006, the Pittsburg SNFs and PharMaster each entered into Pharmacy Services Agreements (the "Original PSAs"), which set forth the terms and conditions of PharMaster's provision of pharmaceutical goods and services to the Pittsburg SNFs.[1] The Original PSAs were signed by Messrs. Licari and D'Arcangelo, respectively, on behalf of PharMaster, LP and the Pittsburg SNFs. Shortly thereafter, Licari and D'Arcangelo began to explore selling PharMaster(Sweet Depo. at p. 70).

Specifically, the Original PSAs contained a term of 4 years, 10 months (February 1, 2006 through December 31, 2010), with three additional three year extensions upon expiration of the Initial Term. See Original PSAs at Section 5.1. Section 5.3 of the Original PSAs further provided that the Original PSAs could be terminated, for any reason, by either party, prior to the expiration of the Initial Term by providing written notice 60 days prior to the effective date of the requested termination. Section 4.1 of the Original PSAs also stated that the parties were entering into the agreement with the intent of conducting their relationship in full compliance with applicable, state, local and federal law, including, without limitation, the federal Anti-Kickback Statute.

During negotiations to sell PharMaster, prospective buyers indicated problems with the Original PSAs. from discussions between PharMaster and its investment banker, as well as discussions between PharMaster and other pharmacies looking at the PharMaster offering, PharMaster's owners reached the conclusion that an increase in the term length, among other changes "is what would make the pharmacy more attractive." (Licari Depo. at 84).

Specifically, Omnicare, another institutional pharmacy company and the largest competitor of PharMerica, approached PharMaster in late 2007 and early January 2008 regarding the potential sale of PharMaster to Omnicare. (HOUL006168.001-005). According to PharMaster's investment banker, Omnicare had concerns that the language contained in the Original PSAs that allowed for termination without cause with 60 days' notice "implie[d] 100% of the revenue could be terminated in

---

[1] While I have only been provided one copy of the Original PSA, my opinions are based upon the assumption that the terms of each with respect to the other Pittsburg SNF's are identically the same but for the name of the facility, which I believe to be consistent with the deposition testimony of William Jacobson and Peter Licari.

4

60 days." (HOUL009204.001). In response to inquiries by Omnicare regarding the term length and termination provisions of the Original PSAs then in effect, the owners of PharMaster stated that the "60 day termination clause would be eliminated on the contract the nursing homes would enter into with Omnicare." (*Id.* at 006168.002-.003). More specifically, the owners of PharMaster stated that "[i]n effect we as the nursing home operators would enter into a contract with the terms the [sic] Omnicare needs to do the Rx sale. We just need to have terms that would be reasonable in the eyes of Medicare. I could see at least a 10 term only terminable by the facility for egregious defaults by the Rx (i.e. 50% medication error rates etc)." (*Id.*). PharMaster's owners stated on January 22, 2008, that "we expect that the terms of the contracts between the Rx and the nursing homes will say what they want them to say." (*Id.*). The owners of PharMaster further stated their intent to "sign a new contract between a new Pharmacy buyer and our Texas facilities upon a sale," which would include "whatever contract Term the new buyer would feel necessary, and in satisfaction of all Compliance Regs." (*Id.* at 006168.00.003-.004). PharMaster also appeared to be searching for a "structure" that would avoid regulatory scrutiny and/or quell the apparent regulatory concerns raised by Omnicare's CIA officer, further demonstrating PharMaster's own knowledge of the regulatory issues involved. (HOUL007396.001).

Sometime after January 1, 2008, the Original PSAs were amended and/or superseded when the prior owners of the Pittsburg SNFs (namely, Licari and D'Arcangelo) and PharMaster entered into new Pharmacy Services Agreements (the "Initial January 2008 PSAs") prior to the expiration of the Original PSAs. The January 2008 PSAs contained substantially different terms than the Original PSAs in important respects. Specifically, Section 6.1 of the Initial January 2008 PSAs contained a ten (10) year term, with an automatic extension of three additional 3-year periods unless written notice was given at least ninety days prior to the expiration. The Initial January 2008 PSAs did not contain a provision that allowed the parties to terminate the January 2008 without cause, as Section 5.3 of the Original PSAs did. Rather, the January 2008 PSAs could only be terminated upon default by either party. A default included, but was not limited to, either the Pharmacy or the Facility's inability to substantially perform its material obligations and failure to cure any such failure within 30 days of receiving written notice of such failure. The Initial January 2008 PSAs also contained the same language as the Original PSAs concerning the intent to comply with applicable laws, including the Federal Anti-Kickback Statute.

On February 4, 2008, after the execution of the Initial January 2008 PSAs, the owners of PharMaster stated that they had "a structure that we think may be worth taking back to Omnicare that just might sell well with their CIA officer." (HOUL007396.001). However, in early February 2008, shortly after these communications regarding the revisions to the Original PSAs, as well as the ultimately execution of the January 2008 PSAs, Omnicare was no longer interested in pursuing the purchase of PharMaster. (HOUL07401.001-.002; Ryan Depo. at 212:21-213:2).

5

The Second January 2008 PSA was in response to negotiations between PharMaster and PharMerica. PharMerica and PharMaster first began discussing the potential purchase of PharMaster by PharMerica on or about January 2, 2008. (PME0003439). Additional discussions continued between PharMaster and PharMerica in late March 2008. The original range discussed by PharMerica for the purchase of PharMaster based upon historical financials was $14MM-$18MM. (HOUL008057.001-.002). However, after receiving the January 2008 PSAs, a letter of intent was executed between the parties dated June 18, 2008, for a sale price of $20.5MM. (PME 3741-3746). The letter of intent also contained a condition precedent to closing that PharMaster enter into amended PSAs with the nursing homes that contained new provisions regarding the required assumption of the PSAs in the event of a change in ownership of the nursing homes, as well as liquidated damages in the event the PSAs were not assumed by any new owner of the nursing homes. (PME3744-3745).

The Second January 2008 PSAs were apparently executed *after* PharMaster's receipt of PharMerica's letter of intent to comply with PharMerica's conditions. Specically, the Second January 2008 PSAs contained two new provisions.

Section 7.4(a) provided in relevant part that:

> Any sale, lease, assignment, delegation or transfer of all or any portion of Facility's or Pharmacy's management, operations, facilities, assets, stock (or any equity) or business to any other person, corporation or entity, including any Facility management company (each such transaction collectively, a "Transfer" and the other party to the Transfer being the Transferee"), will not constitute grounds for the termination or modification of this Agreement by Facility or Pharmacy.
>
> In addition, Facility (and each successor and assign of Facility) shall cause, and make as a requirement of any Transfer, each Transferee to assume in writing all obligations of Facility under the Agreement and utilize Pharmacy and its successors and assignees as the preferred and exclusive provider of all pharmaceuticals to the Facility and its residents ("Preferred Provider").

Thus, even upon the sale or transfer of the operations of the facilities and/or a change in ownership/control, the January 2008 PSAs remained in effect, and the new owners/operators had no choice but to use PharMaster as their Preferred Provider.

The Second January 2008 PSAs also provided for liquidated damages[2] in the event that the facility failed to comply with the provisions of 7.4(a). Section 7.4(b) states:

---

[2] The liquidated damages provision appears to closely correspond with PharMerica's purchase price.

> **7.4 (b) Liquidated Damages.** If Facility fails to comply with section 7.4 (a), Pharmacy will be entitled to recover immediately from Facility as liquidated damages, and not as a penalty, an amount equal to $40 per each licensed bed in the Facility multiplied by the remaining number of months in the initial term (or fraction thereof). Both parties acknowledge and agree that the damages which Pharmacy would suffer upon Facility's failure to comply with Section 7.4 (a) would be difficult to calculate, and that the liquidated damages set forth herein represent the parties' reasonable estimate of the actual damages that would be incurred by Pharmacy in the event of any such termination. The liquidated damages payable under this subparagraph shall be in addition to amounts payable under this Agreement for goods sold, services rendered and other claims and charges attributable to the period prior to the effective date for failure to comply with Section 7.4 (a).

PharMaster and PharMerica then continued to negotiate a purchase/sale until a sale was closed, sometime after October 17, 2008, the date of the Asset Purchase Agreement between PharMaster and PharMerica. (PME21925-21983).

As a condition of the Asset Purchase Agreement, the Second January 2008 PSAs were then subsequently amended by PharMaster and the prior owners of the Pittsburg SNFs (Licari and D'Arcangelo, also the owners of PharMaster) on or about October 20, 2008 (the "October 2008 PSAs").[3] These amendments were made to include the new terms requested by PharMerica, on PharMerica's standard form, which was to be assumed by PharMerica at the time the assets of Pharmaster were transferred to PharMerica. (PME00699-PME1004). The amendments contained in the October 2008 PSAs included, but were not limited to, a change in the term, which became effective on October 20, 2008, and expired on December 31, 2017, more than nine (9) years later. (*Id.*). The October 20, 2008 PSA included the same termination and assumption provisions as the Second January 2008 PSAs, as well as the liquidated damages provision, the terms of which are set forth above.[4] (*Id.*).

The October 2008 PSA included a number of other onerous provisions, including

- Strengthening the requirement to utilize PharMerica and to get residents to utilize PharMerica (Art. 1(b), (c); Art. 4(d),(g);

- Shifting the burden of customer service to the facilities (Art. 3 (h); Art. 10);

---

[3] Interestingly, the Asset Purchase Agreement states that the "Seller shall use its 'best efforts' to cause each of its nursing home customers ... to enter into a new Pharmacy Services Agreement with Seller on terms reasonably acceptable to Buyer. (PME21952-21953). This language is different from the "condition precedent" language included in the June 18, 2008 letter of intent.

[4] The October 2008 PSAs also included the term regarding the intent of the parties is to conduct their relationship in full compliance with applicable state, local and federal laws, including the federal Anti-Kickback Statute. The October 2008 PSAs also contained representations and warranties, which the October 2008 PSAs did not, stating that "[e]ach party shall comply with all applicable federal, state and local laws, rules and regulations (collectively, "Laws") now in effect or enacted during the term of this Agreement...." See October 2008 PSAs at Section 9(a).

7

- More onerous financial terms (Art. 4 (c )(3); art. 4(d);

- More onerous dispute resolution terms (Art. 4 (c)(3); Art. 5(a); Art. 12; art. 13; Art. 18 (b),(k); and

- More difficult to terminate (Art. 4 (c)(2); art. 5 (b); Art. 16; art. 18(n).

The term of the October 2008 PSAs is longer than any other term for any PSA between PharMerica and any of its nursing home customers. (PME0021790-PME0021814). A review of the term length of PharMerica's other pharmacy services agreements with customers across the country reveals that the term length of the October 2008 PSAs (and the January 2008 PSAs) is the longest term length of any contract between PharMerica and any nursing home customer. (PME21790-PME21814). Rather, the majority of the PharMerica agreements are between 3-5 years. (*Id.*). Notably, PharMerica's standard form of PSA provides for a 3-year term, without any liquidated damages provision. (HOUL008537.001-.008).

Following the sale of PharMaster's assets to PharMerica, PharMerica engaged an independent, third-party appraiser to appraise the intangible assets of PharMaster. (PME1023-PME1102). The appraisal report valued the "Customer Relationships" of PharMaster at $17.2MM. (PME1069). This value was based upon the "estimate of future revenue expected from the acquired customer relationships," which were derived solely from the remaining term of the October 2008 PSAs. (PME1065). According to the appraiser, PharMerica management indicated "that the typical market participant interested in the PharMaster acquisition would view the current customer relationships as an asset of central importance." (*Id.*). Thus, even PharMerica's own outside appraiser attributed almost all of the value of PharMaster to the value of the guaranteed future income stream provided under the October 2008 PSAs.

    B.    The Anti-Kickback Statute

The anti-kickback statute, 42 U.S.C. §1320a-7b(b), makes it a criminal offense knowingly and willfully to offer, pay, solicit or receive any remuneration to induce referrals of items or services reimbursable by the Federal health care programs. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. The statute has been interpreted to cover any arrangement where one purpose of the remuneration is to obtain money for the referral of patients or services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), cert. denied, 476 U.S. 988 (1985).

8

Violations of the statute constitute a felony punishable by a maximum fine of $25,000, imprisonment up to five years or both. Conviction will also lead to automatic exclusion from Federal health care programs, including Medicare and Medicaid. The OIG may also initiate administrative proceedings to exclude persons from the federal and state health care programs or to impose civil monetary penalties for violations of the anti-kickback statute.

    C.    Settlement of Civil Money Penalty Proceeding Between United States Department of Health and Human Services Office of Inspector General and PharMerica

Based upon information obtained from the OIG via a FOIA request, it is my understanding that the OIG issued a demand letter to PharMerica Drug Systems, Inc., a subsidiary of PharMerica, Inc., on June 17, 2004, regarding allegations that it had violated the anti-kickback statute. The demand letter sought penalties and damages from PharMerica totaling $21.8 million and a ten-year exclusion from participation in the Federal healthcare programs.[5]

Specifically, the OIG alleged that PharMerica's purchase of a small Virginia captive institutional pharmacy for an excessive amount in return for a commitment from the sellers of the pharmacy (who also owned 17 nursing homes and 8 assisted living facilities that were serviced by the small Virginia pharmacy) to refer Medicaid patients' pharmacy business to PharMerica for a period of 7 years, was a violation fo the anti-kickback statute. The purchase price of the pharmacy was $7.2 million, which was based almost exclusively upon the value of the future business based upon the 7 year commitment. In furtherance of the kickback scheme, the OIG alleged that PharMerica and the institutional pharmacy's sellers renegotiated the pharmacies' PSAs to (i) extend the contracts' term to seven years, (ii) include a more favorable pricing term; and (iii) restrict the nursing facilities' ability to terminate the PSAs. The OIG claimed that the agreement between the parties violated the anti-kickback statute's prohibition on the payment of remuneration to induce the referral of Federal health care patients or business. Ultimately, PharMerica entered into a Corporate Integrity Agreement (the "CIA") on March 29, 2005, which included various obligations on the part of PharMerica in terms of its business operations. In addition, the CIA provided that PharMerica shall notify the OIG of any purchase of any new business unit or location that furnishes items or services that may be reimbursed by Federal healthcare programs. PharMerica was also required to pay a penalty of $5,975,000.00 at the time a record penalty under the CMP

---

[5] Notably, PharMaster's owners were well aware of these issues, having been a customer of PharMerica at the time the letter was sent, and having inquired of PharMerica regarding the impact that the OIG's claims may have on the provision of pharmacy services to the nursing homes. (CHR024337-CHR024340).

9

III. Summary of Opinions

    A. Experienced healthcare attorneys reviewing the arrangements between PharMerica and PharMaster would conclude that the arrangement violated the federal health care anti-kickback statute.

    B. It is my opinion that the arrangement between PharMerica and PharMaster violated the federal health care anti-kickback statute.

    C. It is my opinion that PharMerica was aware that the arrangement between PharMaster and the Pittsburg SNFs via the January 2008 PSAs and the October 2008 PSAs, violated the anti-kickback statute.

    D. It is my opinion that the actions of PharMaster, Licari and D'Archangelo in creating the January 2008 PSAs, then shortly thereafter soliciting and receiving remuneration from PharMerica (via the sale of PharMaster) for the referral of business from the Pittsburgh SNFs was a violation of the anti-kickback statute.

IV. Opinions and Basis for Opinions

The reasons for my opinion are as follows:

In my opinion, experienced health care counsel and/or reasonably prudent pharmacies would conclude that the purchase of PharMaster by PharMerica, including the purchase of the PharMaster PSAs, violated the federal anti-kickback statute. Simply put, the PharMaster PSAs and the asset purchase of PharMaster by PharMerica were shams designed to disguise the unlawful solicitation, receipt, offer and payment of monies for the referral of future sale of the Pittsburg SNFs' pharmacy business.

The anti-kickback statute prohibits health care entities from buying federal health care program business. For example, hospitals cannot pay physicians to refer or use their hospital and pharmacies cannot pay nursing homes for their pharmacy business.

That is exactly what Pharmerica did when it bought PharMaster: it bought the pharmacy referrals from the Pittsburgh SNFs under the guise of purchasing PharMaster and its pharmacy services agreements.

PharMaster was not an independent institutional pharmacy that had substantial business arrangements with unrelated nursing facilities and other health care providers. Rather, PharMaster was a "captive" institutional pharmacy that was controlled by the same two individuals who owned the Pittsburgh SNFs (Licari and D'Archangelo). When prospective purchasers of PharMaster expressed concern with the Original PSAs, the owners caused the Pittsburgh SNFs to enter into new

10

PSAs with PharMaster, and then "sold" the now locked up pharmaceutical referrals to PharMerica.

The PharMaster pharmacy service agreements were not conventional PSAs. Institutional pharmacies have little leverage and a relatively weak bargaining position compared to nursing facilities, with pharmacies competing for the nursing facilities' business on price and service. Typically, a pharmacy service agreement will have a duration of, at a maximum, several years and provide the nursing facility the ability to terminate the arrangement without cause with reasonable advance notice. While the PharMaster 2006 PSAs had a relatively long term of almost five years, it is typical in that it provided that the nursing facility could terminate without cause on sixty-days' notice. A review of the term length of PharMerica's other pharmacy services agreements with customers across the country reveals that the term length of the October 2008 PSAs (and the January 2008 PSAs) is the longest term length of any contract between PharMerica and any nursing home customer. (PME21790-PME21814). Rather, the majority of the PharMerica agreements are between 3-5 years. (Id.).

Compared to a typical PSA, including the 2006 PharMaster Original PSA, the Second January 2008 PharMaster PSAs that were sold to/assumed by PharMerica contained several unusual provisions. First, the duration of the contracts is approximately ten years, which in my experience is much longer than even the more lengthy arrangements of 3-5 years. Second, the PSAs could only be terminated for cause; typically most PSAs are terminable without cause with reasonable advance notice (such as that contained in the Original PSAs). Third, the January 2008 PSAs and October 2008 PSAs were required to be assumed by any purchaser of the nursing home; in my experience, I cannot recall ever seeing a similar provision and cannot think of any reason why a facility would agree to such a provision other than to provide future value to its existing pharmacy services agreements. In fact, the January and October 2008 PSAs provided for liquidated damages inuring to PharMaster in the event the facilities transferred ownership or operations without the required assumption of the PSAs. In essence, the nursing homes bargained for a much less-favorable PSA than what they had before, which is illogical and unsound business. Thus, the only plausible explanation for their agreeing to do so was because the owners of the nursing homes, Licari and D'Arcangelo, desired to benefit PharMaster, which they also owned, knowing that they were already marketing the nursing homes for sale.

The effect of the January 2008 PSAs (and the subsequent revisions contained in the October 2008 PSAs to be assumed by PharMerica) was to guarantee that any purchaser of PharMaster (in this case, PharMerica) would be purchasing substantially all of the pharmaceutical referrals of the Pittsburgh SNFs. The timing of the negotiations with PharMerica are consistent with this conclusion. PharMaster was in negotiations to sell to PharMerica within 5 months of the execution of the January 2008 PSAs, and the purchase price for PharMaster increased dramatically after the inclusion of the liquidated damages and ironclad mandatory assignment

11

language was included as a condition precedent to closing, which further guaranteed that PharMerica the revenue stream under the PSAs as a result of Licari and D'Arcangelo's influence on PharMaster and the nursing homes. Thus, it is my opinion that the actions of PharMerica, PharMaster, Licari and D'Archanelo was a violation of the federal anti-kickback statute.

As set forth above, the net effect of the provisions in the January 2008 and October 2008 PSAs was to lock up for ten years the pharmaceutical referrals of the Pittsburgh SNFs. Since the acquisition price paid by PharMerica was a function of the projected earnings from the PSAs, PharMerica was paying remuneration to the owners of the Pittsburgh SNFs for their referrals. The Purchase Price Allocation contained with the Asset Purchase Agreement and the third-party appraisal support this fact. Given the unusual terms of the PSAs, PharMerica could not have failed to understand that it was buying the pharmaceutical referrals of the Pittsburgh SNFs.

Moreover, it is not uncommon for purchasers of captive institutional pharmacies to negotiate and amend the terms of the existing pharmacy services agreements. It is clear that PharMerica knew that the terms of the PSAs were fully negotiable up until the closing. However, PharMerica choose to keep the same termination provisions and requirement that the October 2008 PSAs be assumed by any subsequent purchaser/operator of the Pittsburg SNFs. PharMerica knew that the PSAs were not arms-length agreements and were fully controlled by common owners. Thus, it is my opinion that PharMerica purchased PharMaster knowing it was paying for ten years of pharmaceutical referrals from the Pittsburg SNFs.

Finally, PharMerica must have known, or at the very least, should have known, that the transaction with PharMaster was unlawful and/or PharMaster's own prior changes to the PSAs to lock in future business was a violation of the anti-kickback statute. PharMerica had already paid almost $ 6 million to the United States Department of Health and Human Services to settle a virtually identical claim. The government's pleadings in that case specifically questioned the excessive term of the agreements (7 years); the pricing provisions; and the termination provisions. The 2008 PharMaster PSAs all have similar questionable provisions.

For all of these reasons, I conclude that the transaction between PharMaster and PharMerica, including the 2008 PSAs, violated the federal anti-kickback statute and/or the public policy rationales for which the anti-kickback statute was created.

*[signature]*

Kevin G. McAnaney

**APPENDIX A**

Kevin McAnaney

RECENT EXPERT WITNESS EXPERIENCE

1. Haywood Regional Medical Center v. Dr. Richard Jones, NC Superior Ct, 04 CVS 0689, Asheville, NC

   Expert for HRRC on Stark and AKS in action on breach of recruitment agreement. Physician claimed the agreement violated Stark law. Testimony at hearing. Spring 2007.

2. Home Town Health Plan, et al v. Aultman Health Foundation, et al, Tuscarawas County (Ohio) Common Pleas Case No. 2006-CV-06-0350

   Expert for health plan that payments to primary care physicians for exclusive contracts and options to purchase practice by insurance plan wholly owned by hospital violated Stark and anti-kickback statutes. Deposition; Spring 2008.

3. Confidential arbitration between Hospital and Medical School

   Expert for hospital. Deposition and Testimony at hearing rebutted medical school assertion that contract between hospital and medical school pathology department violated anti-kickback statute. Summer 2009.

4. US ex rel Repko v. Guthrie Clinic, Ltd., et al, US Dt. Ct. MD PA, No. 3:CV-04-1556

   Expert for Health System in declined qui tam alleging hospital support payments to affiliated medical practice violates Stark and anti-kickback statute. Deposition. Fall 2009.

5. Doucet v. Acadiana Otolarynology Head & Neck Surgery, LLC, American Health Lawyer Assn. ADR Case No. A-072908-652.

   Expert for claimant physician on Stark and anti-kickback statute in case involving wrongful termination of physician from group practice for whistleblowing. Testimony at arbitration. January 2010.

**APPENDIX A**

6. CSAS/UHHS-Canton, Inc. d/b/a Mercy Medical Center v. Aultman Health Foundation, Stark County (Ohio) Common Pleas Case No. 2007-CV-05277,

   Companion to Home Town. Deposition, Spring 2010.

7. Reed et al v. Memorial Hermann Surgery Center The Woodlands, Inc., District Court of Montgomery County, Texas, Cause No. 07-07-07125-CV

   Expert for ambulatory surgical center ("ASC") investors regarding application of federal anti-kickback statute to ASC investments. Deposition, Fall/Winter 2010.

8. US ex rel Jamison v. McKesson Corp, et al, USDC N. District MS, Case No. 2:08cv0214-SA-DAS

   Expert for McKesson Corp. regarding application of anti-kickback statute to a billing contract with a durable medical equipment supplier. Deposition, Spring/Summer 2011.

**APPENDIX B**

# MATERIALS REVIEWED

1. Plaintiffs' First Amended Complaint and Third Amended Complaint
2. PharMerica East LLC's Motion to Dismiss Plaintiffs' First Amended Complaint
3. PharMerica East LLC's Reply in Support of its Motion to Dismiss
4. Plaintiffs' Response to PharMerica East LLC's Motion to Dismiss
5. Plaintiffs' Surreply to PharMerica East LLC's Reply in Support of its Motion to Dismiss
6. U.S. Magistrate's Report and Recommendation, signed September 7, 2011
7. Documents produced in discovery Bates Numbers PME0000001-00003550
8. Documents produced in discovery Bates Numbers TLM 000001-005024
9. Press Release from the Office of Inspector General of the United States Department of Health and Human Services dated June 23, 2004 relating to the initiation of kickback civil money penalty case against PharMerica Drug Systems Inc and accompanying Demand Letter
10. Inspector General's Preliminary Statement in the cases The Inspector General v. PharMerica and Inspector General v. PDSI
11. Pre-Hearing Memorandum of Petitioner PDSI
12. Respondent's Motion for Summary Disposition
13. Inspector General's Memorandum In Opposition to Respondent's Motion for Summary Disposition
14. Respondents' Supplemental Motion for Summary Disposition
15. Inspector General's Memorandum in Opposition to Respondents' Supplemental Motion for Summary Disposition
16. Corporate Integrity Agreement between Office of Inspector General and PharMerica, Inc. and Pharmerica Drug Systems, Inc.
17. Press Release from Office of Inspector General entitled "OIG Settles Largest Ever Kickback Civil Monetary Action Against Pharmerica"
18. Documents referenced in the Expert Report
19. The deposition transcripts of Licari, D'Arcangelo, Hurst, Ryan, Sweet, Caneris, Culotta, Tommasetti, and Weishar and exhibits in connection with same.
20. I was also provided electronic access to all documents and produced by the parties and depositions taken in the case. Due to the recent close of discovery, I have not had an opportunity to review all of the documents, but reserve my right to supplement this list and my report based upon such further review.