# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| PITTSBURG SNF LLC, BALCH SPRINGS SNF LLC, BAY OAKS SNF LLC, BELLMIRE SNF LLC, BENBROOK SNF LLC, BIRMINGHAM SNF LLC, BLUEBONNET SNF LLC, CLARKSVILLE SNF LLC, CLYDE SNF LLC, COLONIAL MANOR SNF LLC, COLONIAL MANOR NH SNF LLC, COURTYARD SNF LLC, CROWELL SNF LLC, EL PASO SNF LLC, GARDENDALE SNF LLC, GREENVILLE SNF LLC, HENDERSON SNF LLC, LUBBOCK NH SNF LLC, MCALLEN SNF LLC, MESQUITE NH SNF LLC, MONTERREY SNF LLC, MUNDAY SNF LLC, PALO PINTO SNF LLC, PARK VIEW SNF LLC, PRAIRIE HOUSE SNF LLC, RIVER OAKS SNF LLC, ROSENBERG SNF LLC, SANTE FE SNF LLC, SOUTHEAST SNF LLC, STONEBROOK MANOR SNF LLC, SULPHUR SPRINGS SNF LLC, PINECREST SNF LLC, RENAISSANCE SNF LLC, VERNON SNF LLC, VISTA HILLS SNF LLC, WEDGEWOOD SNF LLC and WHITE SETTLEMENT SNF LLC<br><br>          Plaintiffs,<br><br>v.<br><br>PHARMERICA EAST, INC., as successor in interest to PHARMASTER, L.P.,<br><br>          Defendant/Third-Party Plaintiff,<br><br>v.<br><br>PHARMASTER, L.P., PHARMASTER GP, LLC, PETER LICARI, MICHAEL D'ARCANGELO, WILLIAM D. JACOBSON, and DAVID C. MILLING,<br><br>          Third-Party Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § §     **CIVIL ACTION NO. 2:10-CV-363** |

## SUPPLEMENTAL STATEMENT OF EXPERT OPINIONS AND EXPERT REPORT OF KEVIN MCANANEY

This is my expert report on the work that I have done to date in the course of my engagement as an expert witness for Pittsburgh SNF LLC and the other plaintiffs (collectively, "Pittsburgh SNFs") in the above-referenced proceeding. I have been asked to provide my analysis and assessment of certain business arrangements between the former owners of the Pittsburgh SNFs and PharMerica East, LLC ("PharMerica") relating to the purchase by PharMerica of PharMaster LP ("PharMaster").

Specifically, I have been asked whether the contractual arrangements between PharMerica and PharMaster (including the underlying circumstances relating to how these arrangements were made and/or formed) were structured consistent with the custom and practice in the health care industry to comply with the federal health care program anti-kickback statute, 42 U.S.C. § 1320a-7b(b). In particular, I have been asked whether the contractual arrangements are usual and customary in the healthcare industry and, more specifically, whether those arrangements were violative of the anti-kickback statute.

## I.  BACKGROUND AND QUALIFICATIONS

I specialize in federal health care fraud and abuse laws and have over 25 years of experience in health law, including substantial experience working in and with the federal government on the regulatory framework upon which I am opining.

I was the Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General of the United States Department of Health and Human Services ("HHS") from 1997 until 2003. In that position, I was responsible for issuing formal guidance to the regulated community through advisory opinions, fraud alerts and special bulletins, compliance program guidance, and regulations related to the fraud and abuse statutes and regulations enforced by the Office of Inspector General ("OIG"), including the anti-kickback statute, 42 U.S.C. § 1320a-7b(b) and the physician self-referral law, 42 U.S.C. § 1395nn (commonly known as the "Stark law"). In that position, I also was a principal author of the 1999 anti-kickback statute "safe harbor" rulemaking, 64 Fed. Reg. 63518 (November 19, 1999).

I also was the principal author of the Stark Phase I and Phase II rulemakings, 66 Fed. Reg. 856 (January 4, 2001); 69 Fed. Reg. 16054 (March 26, 2004). In addition, I worked closely with the United States Department of Justice ("DOJ") in developing cases involving the anti-kickback statute and Stark law, including the use of such claims as predicates for False Claims Act litigation.

Since May 2003, I have specialized my legal practice on the regulation of Medicare fraud and abuse. I have been retained by the Centers for Medicare and Medicaid, the Office of the Assistant Secretary for Planning and Development in HHS, and the Medicare Payment Advisory Commission, an independent Congressional agency for my expertise in the federal health care fraud law and regulation. I regularly counsel health care entities on the Stark and anti-kickback statute and regulations, including

2

how to structure arrangements to comply with those laws.  In particular, I have counseled clients on compliance issues related to contractual arrangements and joint ventures.

Prior to joining the Office of Inspector General ("OIG"), I practiced health and regulatory law with the law firm of Dewey Ballantine for 13 years, including ten years as a partner.

I also served from 1981 to 1983 as Assistant Counsel to New York Governor Hugh Carey with principal responsibility for legislation and litigation affecting the health and human services agencies, including the Medicaid program, and from 1980 to 1981 as the Director of Legal Affairs for the New York Hospital.

I am currently an adjunct professor at the University of Maryland Law School, a member of the Advisory Board for the Bureau of National Affairs' Health Care Fraud Reporter, and a frequent speaker on health care fraud issues. I am a past member of the Board of Directors of the American Health Lawyers Association.

I have been qualified at trial as an expert on the reasonableness of interpretation of the anti-kickback statute. The matters in which I have given deposition or trial testimony as an expert witness in the last four years are set forth in Appendix A to this report.

I am being compensated for my time at a rate of $500 per hour for my services in preparing this report.

I have reviewed certain documents that counsel for the Pittsburgh SNFs provided me, as specifically set forth in Appendix B to this report, and I have been provided access to what I understand to be the complete production by all parties to this matter.    I have also undertaken independent investigation regarding certain regulatory issues involving PharMerica (or its parent/affiliate), as outlined below. I have also reviewed the relevant statutes, regulations, preambles, and government guidance related to the anti-kickback statute law.  This report is based on my experience and knowledge of the custom and practice of regulators and the health care industry with respect to compliance with the federal anti-kickback statute, as well as my knowledge of the federal agency issued guidance including OIG advisory opinions, other OIG issued guidance, and the statutory, regulatory and case law to date.

I reserve the right to modify or amend the report based on further discovery in the litigation. I also reserve the right to provide any rebuttal opinions in response to any witness and/or expert opinions provided by PharMerica and/or Third-Party Defendants in connection with this matter.

I.    BACKGROUND

   A.    Summary of Transaction

Based upon my review of the documents provided, it is my understanding that, on or about July 28, 2004, the prior owners of the Pittsburg SNFs retained brokers to help them sell forty nursing homes including the Pittsburg SNFs. (HOUL00819.001-HOUL00819.010). Simultaneously therewith, Peter Licari and Michael D'Archangelo paid $37,500 each, from personal bank accounts, to Houlihan Lokey Howard & Zukin Capital. (HOUL00819.011). Shortly thereafter, the prior owners of the Pittsburg SNFs (namely, Peter Licari and Michael D'Arcangelo), ventured to create a captive pharmacy that would serve to provide pharmaceutical goods and services to the Pittsburg SNFs (at least 35 of them, excluding Munday and Crowell). As a result, , on or about March 21, 2005, Messrs. Licari and D'Arcangelo formed PharMaster, LP("PharMaster") which in the following years begin  servicing their own facilities (PME0005640).

Between approximately December 2005 and April 2006, the Pittsburg SNFs and PharMaster each entered into Pharmacy Services Agreements (the "Original PSAs"), which set forth the terms and conditions of PharMaster's provision of pharmaceutical goods and services to the Pittsburg SNFs.[1] (CHR001190-CHR001203; CHR001817-CHR001830). The Original PSAs were less than five years in duration with three additional three year extensions upon expiration of the Initial Term. *See* Original PSAs at Section 5.1.  Each expired December 31, 2010. Section 5.3 of the Original PSAs further provided that the Original PSAs could be terminated, for any reason, by either party, prior to the expiration of the Initial Term by providing written notice 60 days prior to the effective date of the requested termination.  Section 4.1 of the Original PSAs also stated that the parties were entering into the agreement with the intent of conducting their relationship in full compliance with applicable, state, local and federal law, including, without limitation, the federal Anti-Kickback Statute. The Original PSAs were signed by Messrs. Licari and D'Arcangelo, respectively, on behalf of PharMaster, LP and the Pittsburg SNFs.

Shortly after the pharmacy commenced operation, , Licari and D'Arcangelo began to explore selling PharMaster(Sweet Depo. at p. 70).  In a May 2006 Confidential Offering Memorandum prepared by Houlihan Lokey, Pittsburg SNF's prior owners indicated, "the Company expects any buyer either to acquire the pharmacy as part of this transaction, or enter into a long-term contract with the pharmacy concurrently with the purchase of the facilities." (HOUL003644.008).

---

[1] While I have only been provided with three different Original PSAs, my opinions are based upon the assumption that the terms of each with respect to the other Pittsburg SNF's are identically the same but for the name of the facility and the start/execution date, which I believe to be consistent with the deposition testimony of William Jacobson and Peter Licari.

During negotiations to sell PharMaster, prospective buyers indicated problems with the Original PSAs. From discussions between PharMaster and its investment banker, as well as discussions between PharMaster and other pharmacies looking at the PharMaster offering, PharMaster's owners reached the conclusion that an increase in the term length, among other changes "is what would make the pharmacy more attractive." (Licari Depo. at 84).

Specifically, Omnicare, another institutional pharmacy company and the largest competitor of PharMerica, approached PharMaster in late 2007 and early January 2008 regarding the potential sale of PharMaster to Omnicare. (HOUL006168.001-005). According to PharMaster's investment banker, Omnicare had concerns that the language contained in the Original PSAs that allowed for termination without cause with 60 days' notice "implie[d] 100% of the revenue could be terminated in 60 days." (HOUL009204.001). In response to inquiries by Omnicare regarding the term length and termination provisions of the Original PSAs then in effect, the owners of PharMaster stated that the "60 day termination clause would be eliminated on the contract the nursing homes would enter into with Omnicare." (*Id.* at 006168.002-.003). More specifically, the owners of PharMaster stated that "[i]n effect we as the nursing home operators would enter into a contract with the terms the [sic] Omnicare needs to do the Rx sale. We just need to have terms that would be reasonable in the eyes of Medicare. I could see at least a 10 term only terminable by the facility for egregious defaults by the Rx (i.e. 50% medication error rates etc)." (*Id.*). PharMaster's owners stated on January 22, 2008, that "we expect that the terms of the contracts between the Rx and the nursing homes will say what they want them to say." (*Id.*). The owners of PharMaster further stated their intent to "sign a new contract between a new Pharmacy buyer and our Texas facilities upon a sale," which would include "whatever contract Term the new buyer would feel necessary, and in satisfaction of all Compliance Regs." (*Id.* at 006168.00.003-.004). PharMaster also appeared to be searching for a "structure" that would avoid regulatory scrutiny and/or quell the apparent regulatory concerns raised by Omnicare's CIA officer, further demonstrating PharMaster's own knowledge of the regulatory issues involved. (HOUL007396.001).

Licari and D'Arcangelo had difficulty selling the pharmacy. To increase the marketability, D'Arcangelo and Licari significantly modified the PSAs in January of 2008, notably by removing the provision that allowed the facilities to terminate upon 60 days notice and by extending the term from less than five years to ten years, almost three years prior to the expiration of the Original 2006 PSAs. Licari explained in his deposition, "we were getting the feeling that that was going to be the more acceptable term. They didn't want to buy a pharmacy that they would pay X amount of dollars for and then, you know, take the chance that the contracts could end." (Licari Dep. At p.84).

5

It was sometime after January 1, 2008, that the Original PSAs were amended and/or superseded. The prior owners of the Pittsburg SNFs (namely, Licari and D'Arcangelo) and PharMaster entered into new Pharmacy Services Agreements (the "Initial January 2008 PSAs"). While the Agreements are dated January 1, 2008, it was not until January 28, 2008, that Peter Licari indicated "we have changed the term for our PharMaster contract to a 10 year terms beginning Jan 1, 2008. We have removed the "30 day cancellation at anytime clause" and allowed for termination only for "material breach of services." (HOUL4109.001). As noted above, the amendment took place approximately 3 years prior to the expiration of the Original 2006 PSAs.

The Initial January 2008 PSAs contained substantially different terms than the Original PSAs in important respects. Specifically, Section 6.1 of the Initial January 2008 PSAs contained a ten (10) year term with an automatic extension of three additional 3-year periods unless written notice was given at least ninety days prior to the expiration. The Initial January 2008 PSAs also did not contain a provision that allowed the parties to terminate the January 2008 without cause, as Section 5.3 of the Original PSAs had. Rather, the January 2008 PSAs could only be terminated upon default by either party. A default included, but was not limited to, either the Pharmacy or the Facility's inability to substantially perform its material obligations and failure to cure any such failure within 30 days of receiving written notice of such failure. [2]

On February 4, 2008, after the execution of the Initial January 2008 PSAs, the owners of PharMaster stated that they had "a structure that we think may be worth taking back to Omnicare that just might sell well with their CIA officer." (HOUL007396.001). However, in early February 2008, shortly after these communications regarding the revisions to the Original PSAs, as well as the ultimate execution of the Initial January 2008 PSAs, Omnicare was no longer interested in pursuing the purchase of PharMaster. (HOUL07401.001-.002; Ryan Depo. at 212:21-213:2).

PharMerica and PharMaster first began discussing the potential purchase of PharMaster by PharMerica on or prior to January 2, 2008 before execution of the Initial January 2008 PSA.. (PME0003439). On or about March 28, 2008, a copy of the Initial January 2008 PSAs (with the ten-year locked in term) was sent by PharMaster to PharMerica. (PME0021630). PharMerica responded by providing a letter of intent which stated PharMerica would pay between $14 and $18 million for PharMaster. (HOUL000478.001). On or about April 18, 2008, Tim Jolly, PharMerica's Vice-President of Acquisitions indicated to a Houlihan Lokey representative that, "as far as the price, he will not be able to stretch beyond his current range as the $18 million on the top end is a greater multiple already than what they have historically paid. He would be very surprised if the purchase price exceeds the $18 million." (CHR037525). On or about May

---

[2] The Initial January 2008 PSAs also contained the same language as the Original PSAs concerning the intent to comply with applicable laws, including the Federal Anti-Kickback Statute.

22, 2008, PharMerica sent a letter of intent to purchase PharMaster for $17 million. (CHR037399).

On or about June 5, 2008, PharMerica materially increased the purchase price to $20.5 million, in exchange for the principals of PharMaster accepting as a condition precedent to the sale, to again amend the PSAs ("Second Amended January 2008 PSA"). The condition precedent to the $20.5 million bid required PharMaster to modify the Initial January 2008 PSAs to require any new owner of the nursing homes to assume the ten-year locked in term PSAs as well as liquidated damages in the event the PSAs were not assumed by any new owner of the nursing homes. (CHR038905-CHR038910).

Section 7.4(a) provided in relevant part that:

> Any sale, lease, assignment, delegation or transfer of all or any portion of Facility's or Pharmacy's management, operations, facilities, assets, stock (or any equity) or business to any other person, corporation or entity, including any Facility management company (each such transaction collectively, a "Transfer" and the other party to the Transfer being the Transferee"), will not constitute grounds for the termination or modification of this Agreement by Facility or Pharmacy.

> In addition, Facility (and each successor and assign of Facility) shall cause, and make as a requirement of any Transfer, each Transferee to assume in writing all obligations of Facility under the Agreement and utilize Pharmacy and its successors and assignees as the preferred and exclusive provider of all pharmaceuticals to the Facility and its residents ("Preferred Provider").

The Second Amended January 2008 PSAs also provided for liquidated damages[3] in the event that the facility failed to comply with the provisions of 7.4(a). Section 7.4(b) states:

> **7.4 (b) Liquidated Damages.** If Facility fails to comply with section 7.4 (a), Pharmacy will be entitled to recover immediately from Facility as liquidated damages, and not as a penalty, an amount equal to $40 per each licensed bed in the Facility multiplied by the remaining number of months in the initial term (or fraction thereof). Both parties acknowledge and agree that the damages which Pharmacy would suffer upon Facility's failure to comply with Section 7.4 (a) would be difficult to calculate, and that the liquidated damages set forth herein represent the parties' reasonable estimate of the actual damages that would be incurred by Pharmacy in the event of any such termination. The liquidated damages payable under this subparagraph shall be in addition to amounts payable under this Agreement for goods sold, services rendered and other claims and charges attributable to the period prior to the effective date for failure to comply with Section 7.4 (a).

On or about June 18, 2008, the letter of intent with a few minor modifications was executed by both parties. By July 14, 2008, PharMaster created at least a third version of

---

[3] The liquidated damages provision appears to closely correspond with PharMerica's purchase price.

the PSAs, again, prior to the expiration of the Initial January 2008 PSAs term, and, again, to add provisions which require referral of business as a condition of sale and would likely be considered less favorable to the Pittsburg SNFs, (the "July 2008 PSA"). (HOUL007449.001). At some point thereafter, the July 2008 PSA was backdated to January 1, 2008 (the "Second Amended January 2008 PSAs") (PME-0000001). [4]

PharMaster and PharMerica then continued to negotiate a purchase/sale until a sale was closed, sometime after October 17, 2008, the date of the Asset Purchase Agreement between PharMaster and PharMerica. (PME21925-21983).

As a condition of the Asset Purchase Agreement, the Second Amended January 2008 PSAs were amended or superseded by PharMaster and the prior owners of the Pittsburg SNFs (Licari and D'Arcangelo, also the owners of PharMaster) on or about October 20, 2008 (the "October 2008 PSAs").[5]   These amendments, as their predecessors, were made to include the new terms requested by PharMerica, on PharMerica's standard form, which was to be assumed by PharMerica at the time the assets of PharMaster were transferred to PharMerica. (PME00699-PME1004). The amendments contained in the October 2008 PSAs included, but were not limited to, a change in the commencement date, which became effective on October 20, 2008, and expired on December 31, 2017, more than nine (9) years later, which is the original expiration term. (*Id.*). The October 20, 2008 PSA included the same termination and assumption provisions as the Second Amended January 2008 PSAs, as well as the liquidated damages provision, the terms of which are set forth above.[6] (*Id.*).

The October 2008 PSA included a number of other onerous provisions, including

- Strengthening the requirement to utilize PharMerica and to get residents to utilize PharMerica (Art. 1(b), (c); Art. 4(d),(g);

- Shifting the burden of customer service to the facilities (Art. 3 (h); Art. 10);

- More onerous financial terms (Art. 4 (c )(3); art. 4(d);

---

[4] While it appears from the documents produced in discovery that this was at least the third version of executed PSA, there is no indication in the document that it replaces or supersedes any other PSA and, as previously mentioned, apparently backdated to have the same origination date as its predecessor.

[5] Interestingly, the Asset Purchase Agreement states that the "Seller shall use its 'best efforts' to cause each of its nursing home customers . . . to enter into a new Pharmacy Services Agreement with Seller on terms reasonably acceptable to Buyer. (PME21952-21953). This language is different from the "condition precedent" language included in the June 18, 2008 letter of intent.

[6] The October 2008 PSAs also included the term regarding the intent of the parties is to conduct their relationship in full compliance with applicable state, local and federal laws, including the federal Anti-Kickback Statute. The October 2008 PSAs also contained representations and warranties, which the Backdated to January 2008 PSAs did not, stating that "[e]ach party shall comply with all applicable federal, state and local laws, rules and regulations (collectively, "Laws") now in effect or enacted during the term of this Agreement . . . ." See October 2008 PSAs at Section 9(a).

- More onerous dispute resolution terms (Art. 4 (c)(3); Art. 5(a); Art. 12; art. 13; Art. 18 (b),(k); and

- More difficult to terminate (Art. 4 (c)(2); art. 5 (b); Art. 16; art. 18(n).

The term of the October 2008 PSAs is, according to PharMerica, longer than any other term for any PSA between PharMerica and any of its nursing home customers. (PME0021790-PME0021814). A review of the term length of PharMerica's other pharmacy services agreements with customers across the country reveals that the term length of the October 2008 PSAs (and the January/2008 PSAs) is the longest term length of any contract between PharMerica and any nursing home customer. (PME21790-PME21814). Rather, the majority of the PharMerica agreements are between 3-5 years. (*Id.*). Notably, PharMerica's standard form of PSA provides for a 3-year term, without any liquidated damages provision. (HOUL008537.001-.008).

On December 13, 2008, the outside appraiser initially valued the contracts at $16.9 million with an anticipated life of 12 years, only three years beyond the then nine year lock. (PME0017449-PME0017532). In the next version of the appraisal, the life was substantially increased to 18 years, but the value of the contracts was only increased by three hundred thousand dollars to $17.2 million. (PME0022489-PME0022572).

      B.     The Anti-Kickback Statute

The anti-kickback statute, 42 U.S.C. §1320a-7b(b), makes it a criminal offense knowingly and willfully to offer, pay, solicit or receive any remuneration to induce referrals of items or services reimbursable by the Federal health care programs. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. The statute has been interpreted to cover any arrangement where one purpose of the remuneration is to obtain money for the referral of patients or services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), cert. denied, 476 U.S. 988 (1985).

Violations of the statute constitute a felony punishable by a maximum fine of $25,000, imprisonment up to five years or both. Conviction will also lead to automatic exclusion from Federal health care programs, including Medicare and Medicaid. The OIG may also initiate administrative proceedings to exclude persons from the federal and state health care programs or to impose civil monetary penalties for violations of the anti-kickback statute.

C.     Settlement of Civil Money Penalty Proceeding Between United States Department of Health and Human Services Office of Inspector General and PharMerica

Based upon information obtained from the OIG via a FOIA request, it is my understanding that the OIG issued a demand letter to PharMerica Drug Systems, Inc., a subsidiary of PharMerica, Inc., on June 17, 2004, regarding allegations that it had violated the anti-kickback statute. The demand letter sought penalties and damages from PharMerica totaling $21.8 million and a ten-year exclusion from participation in the Federal healthcare programs.[7]

Specifically, the OIG alleged that PharMerica's purchase of a small Virginia captive institutional pharmacy for an excessive amount in return for a commitment from the sellers of the pharmacy (who also owned 17 nursing homes and 8 assisted living facilities that were serviced by the small Virginia pharmacy) to refer Medicaid patients' pharmacy business to PharMerica for a period of 7 years, was a violation fo the anti-kickback statute.  The purchase price of the pharmacy was $7.2 million, which was based almost exclusively upon the value of the future business based upon the 7 year commitment. In furtherance of the kickback scheme, the OIG alleged that PharMerica and the institutional pharmacy's sellers renegotiated the pharmacies' PSAs to (i) extend the contracts' term to seven years, (ii) include a more favorable pricing term; and (iii) restrict the nursing facilities' ability to terminate the PSAs.  The OIG claimed that the agreement between the parties violated the anti-kickback statute's prohibition on the payment of remuneration to induce the referral of Federal health care patients or business. Ultimately, PharMerica entered into a Corporate Integrity Agreement (the "CIA") on March 29, 2005, which included various obligations on the part of PharMerica in terms of its business operations.  In addition, the CIA provided that PharMerica shall notify the OIG of any purchase of any new business unit or location that furnishes items or services that may be reimbursed by Federal healthcare programs.  PharMerica was also required to pay a penalty of $5,975,000.00 at the time a record penalty under the CMP.

III.     Summary of Opinions

A.     Experienced healthcare attorneys reviewing the arrangements between PharMerica and PharMaster would conclude that the arrangement violated the federal health care anti-kickback statute.

B.     The arrangement between PharMerica and PharMaster violated the federal health care anti-kickback statute.

---

[7] Notably, PharMaster's owners were well aware of these issues, having been a customer of PharMerica at the time the letter was sent, and having inquired of PharMerica regarding the impact that the OIG's claims may have on the provision of pharmacy services to the nursing homes. (CHR024337-CHR024340).

10

C.    PharMerica was aware that the arrangement between PharMaster and the Pittsburg SNFs via the January 2008 PSAs and the October 2008 PSAs, violated the anti-kickback statute.

D.    The actions of PharMaster, Licari and D'Archangelo in creating the January 2008 PSAs, then shortly thereafter soliciting and receiving remuneration from PharMerica (via the sale of PharMaster), among others, for the referral of business from the Pittsburgh SNFs violated the anti-kickback statute.

IV.    Opinions and Basis for Opinions

The reasons for my opinion are as follows:

In my opinion, experienced health care counsel and/or reasonably prudent pharmacies would conclude that the purchase of PharMaster by PharMerica, including the purchase of the PharMaster PSAs, violated the federal anti-kickback statute. The 2008 PharMaster PSAs were created in contemplation of sale and were repeatedly modified to insure that any purchaser was guaranteed substantially all of the pharmacy business from the Pittsburgh SNFs for approximately nine years. Simply put, the 2008 PharMaster PSAs and the asset purchase of PharMaster by PharMerica were shams designed to disguise the unlawful solicitation, receipt, offer and payment of monies for the referral of future sale of the Pittsburg SNFs' pharmacy business.

The anti-kickback statute prohibits health care entities from buying federal health care program business. For example, hospitals cannot pay physicians to refer or use their hospital and pharmacies cannot pay nursing homes for their pharmacy business.

That is exactly what PharMerica did when it bought PharMaster: it bought the pharmacy referrals from the Pittsburgh SNFs under the guise of purchasing PharMaster and its pharmacy services agreements.

PharMaster was not an independent institutional pharmacy that had substantial business arrangements with unrelated nursing facilities and other health care providers. Rather, PharMaster was a "captive" institutional pharmacy that was controlled by the same two individuals who owned the Pittsburgh SNFs (Licari and D'Archangelo). When prospective purchasers of PharMaster expressed concern with the Original PSAs, the owners caused the Pittsburgh SNFs to enter into new PSAs with PharMaster, and then "sold" the now locked up pharmaceutical referrals to PharMerica.

The PharMaster pharmacy service agreements were not conventional PSAs. Institutional pharmacies have little leverage and a relatively weak bargaining position compared to nursing facilities, with pharmacies competing for the nursing

11

facilities' business on price and service. Typically, a pharmacy service agreement will have a duration of, at a maximum, several years and provide the nursing facility the ability to terminate the arrangement without cause with reasonable advance notice. While the PharMaster 2006 PSAs had a relatively long term of almost five years, it is typical in that it provided that the nursing facility could terminate without cause on sixty-days' notice. A review of the term length of PharMerica's other pharmacy services agreements with customers across the country reveals that the term length of the October 2008 PSAs (and the January 2008 PSAs) is the longest term length of any contract between PharMerica and any nursing home customer. (PME21790-PME21814). Rather, the majority of the PharMerica agreements are between 3-5 years. (*Id.*).

Compared to a typical PSA, including the 2006 PharMaster Original PSA, the Initial January 2008 PSAs contained several unusual provisions. First, the duration of the contracts is approximately ten years, which in my experience is much longer than even the more lengthy arrangements of 3-5 years. It is worth noting that PharMerica has no PSA of comparable length. Second, the PSAs could only be terminated for cause; typically most PSAs are terminable without cause with reasonable advance notice (such as that contained in the Original PSAs). The Second Amended January 2008 PSAs and October 2008 PSAs contained even more unusual provisions. Pursuant to those PSAs, the PSAs were required to be assumed by any purchaser of the nursing home; in my experience, I cannot recall ever seeing a similar provision and cannot think of any reason why a facility would agree to such a provision other than to provide future value to its existing pharmacy services agreements. In fact, the Second Amended January and October 2008 PSAs provided for liquidated damages inuring to PharMaster in the event the facilities transferred ownership or operations without the required assumption of the PSAs. In essence, the nursing homes bargained for a much less-favorable PSA than what they had before, which is illogical and unsound business. Thus, the only plausible explanation for their agreeing to do so was because the owners of the nursing homes, Licari and D'Arcangelo, desired to benefit PharMaster, which they also owned, knowing that they were already marketing the nursing homes for sale.

The obvious and intended effect of the Second Amended January 2008 PSAs (and the subsequent revisions contained in the October 2008 PSAs to be assumed by PharMerica) was to guarantee that any purchaser of PharMaster (in this case, PharMerica) would be purchasing substantially all of the pharmaceutical referrals of the Pittsburgh SNFs and all the referrals of any subsequent operator for a ten year period.

Not surprisingly, the purchase price for PharMaster increased dramatically after the inclusion of the liquidated damages and ironclad mandatory assignment language was included as a condition precedent to closing, which further guaranteed PharMerica the revenue stream under the PSAs as a result of Licari and D'Arcangelo's influence on PharMaster, the nursing homes, and the influence they would have over any purchaser of the facilities. Thus, it is my opinion that the

12

actions of PharMerica, PharMaster, Licari and D'Arcangelo were a violation of the federal anti-kickback statute.

As set forth above, the net effect of the provisions in the January 2008 and October 2008 PSAs was to lock up for ten years the pharmaceutical referrals of the Pittsburgh SNFs that the SNFs could influence. Since the acquisition price paid by PharMerica was a function of the projected earnings from the PSAs, PharMerica was paying remuneration to the owners of the Pittsburgh SNFs for their referrals. The Purchase Price Allocation contained with the Asset Purchase Agreement and the third-party appraisal support this fact. As does the fact that PharMerica did not materially value other pharmacy assets. Given the unusual terms of the PSAs, PharMerica could not have failed to understand that it was buying the pharmaceutical referrals of the Pittsburgh SNFs. Likewise, Licari, from his statements about modifying terms to generate interest in the sale, and the following through in conjunction with PharMerica to effectuate and actually modify the PSAs multiple times against the interests of the facilities is evidence of ownership's intent to monetize their referrals.

Moreover, it is not uncommon for purchasers of captive institutional pharmacies to negotiate and amend the terms of the existing pharmacy services agreements. It is clear that PharMerica knew that the terms of the PSAs were fully negotiable up until the closing. However, PharMerica choose to keep the same termination provisions and requirement that the October 2008 PSAs be assumed by any subsequent purchaser/operator of the Pittsburg SNFs. PharMerica knew that the PSAs were not arms-length agreements and were fully controlled by common owners. Thus, it is my opinion that PharMerica purchased PharMaster knowing it was paying for ten years of pharmaceutical referrals from the Pittsburg SNFs.

In this regard, it is especially significant that PharMerica conditioned its June 5, 2008 $20.5 million offer to PharMaster amending its PSAs to require any new owner to assume the PSA or pay substantial liquidated damages. In other words, PharMerica knowingly offered Licari and D'Arcangelo an additional $3.5 million if they would arrange for the future referrals from any other owners of the Pittsburgh SNFs.

Finally, PharMerica must have known, or at the very least, should have known, that the transaction with PharMaster was unlawful and/or PharMaster's own prior changes to the PSAs to lock in future business was a violation of the anti-kickback statute. PharMerica had already paid almost $6 million to the United States Department of Health and Human Services to settle a virtually identical claim. The government's pleadings in that case specifically questioned the excessive term of the agreements (7 years); the pricing provisions; and the termination provisions. The 2008 PharMaster PSAs all have similar questionable provisions.

13

For all of these reasons, I conclude that the transaction between PharMaster and PharMerica, including the 2008 PSAs, violated the federal anti-kickback statute and/or the public policy rationales for which the anti-kickback statute was created.

As discovery is not complete and I am still gathering facts, I respectfully reserve the right to further supplement this report as required should I become aware of additional facts prior to trial.

Kevin G. McAnaney

14