# EXHIBIT D

1

2    IN THE UNITED STATES DISTRICT COURT

    FOR THE EASTERN DISTRICT OF TEXAS

3     MARSHALL DIVISION

4 Civil Action No. 2:10-CV-363

 - - - - - - - - - - - - - - - - - - -x

5 PITTSBURG SNF, LLC, et al,    :

                :

6         Plaintiffs, :

                :

7     - against -    :

                :

8 PHARMERICA EAST, INC., as successor:

 interest to PHARMASTER, L.P.,  :

9              :

  Defendant/Third-Party Plaintiff. :

10             :

     - against -    :

11             :

 PHARMASTER, L.C.; PHARMASTER, G.P.,:

12 LLC; PETER LICARI; MICHAEL  :

 D'ARCANGELO; WILLIAM D. JACOBSON, :

13 and DAVID C. MILLING,   :

             :

14    Third-Party Defendants. :

 - - - - - - - - - - - - - - - - - - -x

15

16       September 20, 2012

        10:00 a.m.

17       1251 6th Avenue

        New York, New York

18

19

20

21   VIDEOTAPED DEPOSITION OF KEVIN

22 McANANEY, held at the above-mentioned time and

23 place, before Randi Friedman, a Registered

24 Professional Reporter and Notary Public within

25 and for the State of New York.

**2**

1
2    APPEARANCES:
3        BRACEWELL & GIULIANI
          Attorneys for Plaintiffs
4
          1445 Ross Avenue, Suite 3800
5        Dallas, Texas 75202
6        BY: MORGAN D. MEYER, ESQ.
7
8        HOLLAND & KNIGHT, LLP
          Attorneys for Defendant, PharMerica,
9        East, LLC
10      10 St. James Avenue
          Boston, Massachusetts 02116
11
          BY: ELIZABETH MITCHELL, ESQ.
12
13
          FOX ROTHSCHILD, LLP
14      Attorneys for Third-Party Defendants
15      2000 Market Street, 20th Floor
          Philadelphia, Pennsylvania 19103
16
          BY: GEORGE J. KRUEGER, ESQ.
17
                    * * *
18
19  ALSO PRESENT:
20      Marc Friedman - Videographer
          Aaron Lichtman
21      Ari Erlichman
          Peter Licari
22      Thomas Crane
23
24
25

**3**

1
2                STIPULATIONS
3        IT IS HEREBY STIPULATED AND AGREED, by
4    and among counsel for the respective parties
5    hereto, that the filing, sealing and
6    certification of the within deposition shall be
7    and the same are hereby waived;
8        IT IS FURTHER STIPULATED AND AGREED  that
9    all objections, except as to form of the
10   question, shall be reserved to the time of the
11   trial;
12       IT IS FURTHER STIPULATED AND AGREED that the
13   within deposition may be signed before any Notary
14   Public with the same force and effect as if
15   signed and sworn to before the Court.
16
                *    *    *    *
17
18
19
20
21
22
23
24
25

**4**

1
2            MR. FRIEDMAN:  We are now on the  10:21:07
3    record.  Please note that all microphones  10:21:08
4    are sensitive and may pick up whisperings  10:21:11
5    and private conversations.  Please turn off  10:21:14
6    all cellphones or place them away from the  10:21:17
7    microphones, as they can interfere with  10:21:19
8    deposition audio.  Recordings will continue  10:21:22
9    until all parties agree to go off the  10:21:24
10   record.                          10:21:26
11          My name is Marc Friedman          10:21:27
12   representing Veritext - New York.  The date  10:21:29
13   today is September 20th, 2012.  The time is  10:21:32
14   approximately 10:20 a.m.  This deposition is  10:21:36
15   being held in the office of Bracewell &      10:21:40
16   Giuliani, LLP located at 1251 Avenue of the  10:21:43
17   Americas, New York, New York, as being taken  10:21:47
18   by the counsel for the defense.  The caption  10:21:51
19   of this case is Pittsburg SNF, LLC, et al  10:21:54
20   versus PharMerica East, LLC, as successor in  10:22:00
21   interest to PharMaster, LP.  This case is    10:22:06
22   filed in the United States District Court  10:22:12
23   for the Eastern District of Texas, Marshall  10:22:12
24   Division, Civil Action No. 2:10-CV363.      10:22:16
25          The name of the witness is Kevin  10:22:24

**5**

1
2    McAnaney.  At this time, the attorneys in  10:22:26
3    the room will identify themselves and the  10:22:28
4    parties they represent, starting with the  10:22:32
5    noticing attorney; after which time our  10:22:34
6    court reporter, Randi Friedman, representing  10:22:36
7    Veritext, will swear in the witness and we  10:22:38
8    can proceed.                    10:22:40
9            MS. MITCHELL:  Elizabeth Mitchell  10:22:42
10   from Holland & Knight representing  10:22:43
11   PharMerica East, LLC, presently known as  10:22:45
12   PharMerica, LLC.  And with me today I have  10:22:50
13   Tom Crane.                    10:22:55
14           MR. KRUEGER:  My name is George  10:22:58
15   Krueger.  I'm with Fox Rothschild.  I      10:22:59
16   represent the third-party defendants.  With  10:23:02
17   me is Peter Licari, one of the third-party  10:23:04
18   defendants.                    10:23:08
19           MR. MEYER:  Morgan Meyer, Aaron  10:23:09
20   Lichtman and Ari Erlichman on behalf of the  10:23:09
21   plaintiffs.                    10:23:16
22
23
24
25

30

```
 1              K. McAnaney
 2     Q.   Okay.  While you were the at the OIG,    10:53:41
 3   did you -- was it part of your job to prosecute  10:53:46
 4   healthcare type cases, such as false claims act  10:53:51
 5   cases or AKS cases?                              10:53:57
 6     A.   I basically -- was basically -- did a     10:54:00
 7   lot of work with the Justice Department in such  10:54:03
 8   cases as sort of the expert in the kickback and  10:54:06
 9   the Stark law.                                   10:54:10
10     Q.   Okay.  So they prosecuted with your       10:54:11
11   assistance?                                      10:54:13
12     A.   Yeah, I basically provided subject        10:54:14
13   matter expertise.                                10:54:17
14     Q.   Who -- let me ask it this way.            10:54:26
15        In your role at the OIG, did you have       10:54:28
16   any role in -- excuse me, in identifying cases   10:54:33
17   that would be prosecuted by DOJ or any other     10:54:37
18   offices associated with DOJ?                     10:54:43
19     A.   I did.                                    10:54:48
20     Q.   And how would you identify such cases?    10:54:49
21     A.   Well, typically, again, they were --      10:54:53
22   my goal would be in looking specifically at cases 10:55:00
23   that involved typically the kickback provision   10:55:03
24   violations of the kickback statute or Stark.  So 10:55:08
25   that was -- that's all I did.  I don't have      10:55:12
```

31

```
 1   expertise in -- I try to stay away from billing  10:55:15
 2   and coding cases.  And typically it would come in 10:55:20
 3   whether through calls from investigators or calls 10:55:24
 4   from other OIG attorneys who were assigned to the 10:55:34
 5   regions.  Basically they would divide up, so      10:55:39
 6   there would be some OIG attorneys who were sort   10:55:44
 7   of paired up with various U.S. Attorneys' Offices 10:55:48
 8   around the country regions.  So when they would   10:55:51
 9   get notice of potential investigations or claims  10:55:56
10   potentially involving the kickback statute or the 10:56:00
11   Stark statute, they would call me.  Attorneys     10:56:05
12   from the Justice Department, when they got cases  10:56:09
13   that they thought had a potential anti-kickback,  10:56:11
14   they would call me.                               10:56:14
15     Q.   Okay.  In one of your reports, there's     10:56:16
16   a reference to your participation or you being    10:56:24
17   the principal author of what I think you referred 10:56:27
18   to as the Stark law or the Stark rule-making;     10:56:31
19   correct?                                          10:56:35
20     A.   What's called the Stark 2 rule-making      10:56:35
21   thing.  Three phases.  Phase I, Phase II and      10:56:39
22   Phase III.  And I was principal author of         10:56:43
23   probably Phase I and Phase II.  I did some work   10:56:45
24   on Phase III.                                     10:56:48
```

32

```
 1              K. McAnaney
 2     Q.   Okay.  And what's the distinction         10:56:49
 3   between the phases?                               10:56:59
 4     A.   Basically it was a bureaucratic, they     10:57:03
 5   could only get -- they promised to get something 10:57:05
 6   out by such and such a date, and they could.  So 10:57:07
 7   we were going to get something out, so we write  10:57:13
 8   it up and said, we'll get this out.  So that's   10:57:16
 9   the main difference.                             10:57:18
10        Phase I covered certain sections of         10:57:19
11   the regulations.  The definitions and the main   10:57:21
12   prohibitions and certain exceptions.  And then   10:57:26
13   Phase II did the rest of the exceptions, except  10:57:28
14   for one.  And then Phase III, which was supposed 10:57:35
15   to do the last exception, didn't do the last     10:57:38
16   exception, but instead went back and changed     10:57:40
17   Phase I and Phase II.                            10:57:43
18     Q.   So the different phases covered           10:57:44
19   different sections as opposed to various         10:57:47
20   iterations of the same thing?                    10:57:49
21     A.   Well, except one could argue some of      10:57:51
22   Phase III goes back and re-does Phase I and Phase 10:57:54
23   II, an important response.  But Phase I and Phase 10:57:58
24   II were specifically different sections of the   10:58:00
25   regulation.                                      10:58:03
```

33

```
 1              K. McAnaney
 2     Q.   Were they all published at the same       10:58:03
 3   time?                                            10:58:05
 4     A.   No.  They were -- the Phase I was in      10:58:05
 5   2001.  At least -- yes, Phase I was 2000.  And   10:58:14
 6   Phase II was -- I think it may have been after I 10:58:19
 7   left.  2004, I think it may have come out.  And  10:58:26
 8   then Phase III is 2007; something like that,     10:58:29
 9   perhaps.                                         10:58:35
10     Q.   While you were at OIG, what was your      10:58:40
11   experience with Pharmacy Services Agreements?    10:58:44
12     A.   Well, I was involved in one case.         10:58:51
13     Q.   And what was that case?                   10:58:56
14     A.   PharMerica.                               10:58:58
15     Q.   And what was -- other than referring      10:59:00
16   to it by PharMerica, is there a name of the case? 10:59:07
17     A.   Well, I don't -- it was an               10:59:11
18   investigation when I was there.                  10:59:15
19     Q.   Okay.  In what time period?              10:59:17
20     A.   I think it's -- it was the               10:59:21
21   investigation that culminated in the settlement. 10:59:22
22     Q.   In the settlement in the CIA that's      10:59:28
23   referenced in your various reports?             10:59:31
24     A.   Yes.                                     10:59:32
25     Q.   At what time period were you            10:59:45
```

9  (Pages  30  to  33)

## 38

K. McAnaney

1
2  MS. MITCHELL: I don't think    11:05:40
3  necessarily because I think that many of    11:05:40
4  those facts have been discussed publicly in    11:05:41
5  settlement materials.    11:05:46
6  MR. MEYER: He obviously can    11:05:47
7  assess for himself. I just wanted to make    11:05:49
8  sure we weren't crossing the line with any    11:05:50
9  privileges or mental impressions.    11:05:54
10  THE WITNESS: Yeah. I'm not sure    11:05:56
11  at the time I came of what specific facts    11:05:58
12  there were. I think -- 'cause I can't -- I    11:06:03
13  mean, I believe that sort of the main facts    11:06:13
14  that were known at that time were    11:06:22
15  essentially the same ones that were    11:06:24
16  ultimately in the settlement, but I can't    11:06:26
17  recall specifically.    11:06:31
18  BY MS. MITCHELL:    11:06:31
19  Q. Did --    11:06:37
20  A. By the settlement, the government    11:06:38
21  alleged in the settlement in their disclosure.    11:06:40
22  Q. Okay. In your reports, and we'll get    11:06:45
23  more into those later, you indicate that in -- in    11:06:48
24  reaching your conclusions in this case and in    11:06:57
25  preparing for report, you collected some    11:06:59

## 39

K. McAnaney

1
2  documents on your own and you did some    11:07:02
3  investigation, including a four-year request.    11:07:04
4  And you've referenced some of these    11:07:06
5  publicly-available materials that talk about the    11:07:09
6  situation with -- and I want to say it's Hollis    11:07:13
7  or Hollins Manor.    11:07:17
8  A. That might be HCM. That rings a bell.    11:07:21
9  Q. But this particular situation that    11:07:24
10  we're talking about.    11:07:26
11  In forming your opinions in this    11:07:28
12  that brings us here today, did you rely    11:07:31
13  exclusively on the materials that you recently    11:07:38
14  collected, or are you also relying upon some of    11:07:43
15  your memories and your experience, your personal    11:07:48
16  experience in that prior investigation?    11:07:52
17  A. No. I'm relying exclusively on the    11:07:57
18  public information that's available on that case,    11:08:00
19  and the general knowledge of the kickback statute    11:08:05
20  and how it's applied to various fact patterns.    11:08:07
21  Q. Okay. In connection with -- I'm not    11:08:11
22  sure I have this name 100 percent accurate, but    11:08:21
23  if we can agree that we'll refer to it as the    11:08:24
24  Hollins Manor case for clarity of the record, in    11:08:26
25  that situation, did you reach a conclusion as to    11:08:32

## 40

K. McAnaney

1
2  whether a violation of the Anti-Kickback Statute    11:08:35
3  had occurred?    11:08:39
4  A. No. At that point, it was a matter    11:08:41
5  under investigation.    11:08:44
6  Q. Okay. I may come back to your role at    11:08:45
7  the OIG and some of your experiences there --    11:08:51
8  well, before we leave there, one last question. I    11:09:01
9  think we started talking about the Hollins    11:09:03
10  Manor case, because I asked you as to what your    11:09:04
11  experiences were, or if you had experiences at    11:09:11
12  the DOJ with the Pharmacy Services Agreements and    11:09:13
13  you identified this situation.    11:09:17
14  Were there other experiences that you    11:09:18
15  had while at OIG with Pharmacy Services    11:09:20
16  Agreements?    11:09:25
17  A. I can't recall.    11:09:26
18  Q. Is it fair to say, then, that if by    11:09:29
19  chance you did, you were not relying on those    11:09:32
20  experiences in connection with the issuance of    11:09:35
21  your opinion in this case?    11:09:37
22  A. Yes. Certainly I -- I do not believe    11:09:39
23  I had any -- I was ever involved in any other    11:09:44
24  investigations involving Pharmacy Services    11:09:47
25  Agreements. What I don't know is whether in the    11:09:49

## 41

K. McAnaney

1
2  advisory role, if people called, if we ever    11:09:54
3  discussed them.    11:09:58
4  Q. And I'm not trying to trip you up.    11:09:58
5  I'm just trying to figure out really what formed    11:10:02
6  the opinions that you're providing in this case,    11:10:04
7  and if there's nothing else that you can think of    11:10:06
8  that you relied upon from your own past    11:10:10
9  experiences that arose from your time at OIG.    11:10:13
10  MR. MEYER: Objection.    11:10:17
11  BY MS. MITCHELL:    11:10:17
12  Q. That's what I'm trying to establish.    11:10:18
13  MR. MEYER: Objection, form.    11:10:21
14  THE WITNESS: Nothing -- nothing    11:10:22
15  specifically with Pharmacy Service    11:10:23
16  Agreements. Obviously my experience at OIG.    11:10:25
17  BY MS. MITCHELL:    11:10:30
18  Q. Understood. When -- I think you said    11:10:31
19  you left OIG in 2003; is that correct?    11:10:35
20  A. Yes.    11:10:38
21  Q. What did you do when you left OIG?    11:10:39
22  A. I went into private practice.    11:10:41
23  Q. And why did you leave OIG?    11:10:42
24  A. Because I was bored and -- I was bored    11:10:45
25  with the job I had. There were jobs I would have    11:10:49

11  (Pages 38 to 41)

**114**

```
 1              K. McAnaney
 2   between the former owners of the Pittsburg SNF's  15:00:53
 3   and PharMerica East -- well, can I say between   15:01:01
 4   PharMaster -- no, between -- between the former   15:01:04
 5   owners of the Pittsburg SNF's and PharMerica      15:01:10
 6   East, I think those contracts would still be      15:01:14
 7   unenforceable against the plaintiffs.             15:01:20
 8       Q.   Mr. McAnaney, is the Stark law           15:01:31
 9   implicated in this case?                          15:01:34
10       A.   I don't believe so.                      15:01:37
11       Q.   Do you have a view as to whether         15:01:42
12   Pharmacy Services Agreements are, per se, legal   15:01:44
13   or illegal?                                       15:01:49
14       A.   I think depending on the                 15:01:53
15   circumstances, they can be either, but I mean,    15:01:55
16   they're typically legal, I presume.               15:02:01
17       Q.   Okay.  But in this instance, you're      15:02:04
18   taking the position that the PSA's are not legal;  15:02:09
19   is that correct?                                  15:02:14
20       A.   Well, I think that they are -- it's      15:02:15
21   sort of not -- the contracts themselves become    15:02:18
22   illegal because they're part of an illegal        15:02:22
23   transaction.  So I don't really think -- the      15:02:25
24   contract itself, in its four corners, might be    15:02:30
25   legal or illegal in some circumstances.  But in   15:02:36
```

**116**

```
 1              K. McAnaney
 2   independent parties, I think it would be.         15:03:52
 3   BY MS. MITCHELL:                                  15:03:54
 4       Q.   What is it about the underlying          15:03:57
 5   transaction, or the facts and circumstances here  15:04:00
 6   that makes you think that there's an issue        15:04:04
 7   implicating the Anti-Kickback Statute?            15:04:06
 8       A.   I think because the PSA's in this case   15:04:11
 9   were a conduit to mask the payment for -- the     15:04:15
10   payment to the Pittsburg SNF prior owners of      15:04:23
11   remuneration for the referrals of the Pittsburg   15:04:30
12   SNF facilities.                                   15:04:33
13       Q.   And what was the remuneration?          15:04:34
14       A.   I believe it is 20.5 million dollars.   15:04:38
15       Q.   And the referrals are what?  Let me     15:04:42
16   back up?                                          15:04:45
17            So the remuneration is the 20.5         15:04:45
18   million dollars paid by PharMerica to the prior   15:04:49
19   owners of PharMaster?                             15:04:53
20       A.   Who were also the prior owners of the   15:04:57
21   Pittsburg SNF's.                                  15:05:00
22       Q.   But that's the remuneration that --     15:05:01
23       A.   Yes.                                     15:05:03
24       Q.   -- you're looking at?                    15:05:03
25       A.   Yes.                                     15:05:04
```

**115**

```
 1              K. McAnaney
 2   the circumstances presented here, I think it is   15:02:40
 3   illegal, and -- it's part of an illegal           15:02:43
 4   transaction and it is; therefore, unenforceable.  15:02:47
 5       Q.   Mr. McAnaney, have you evaluated         15:02:50
 6   whether -- if you took -- if you removed -- if    15:02:53
 7   you just looked at the four corners of the PSA's  15:02:58
 8   and you looked at the arrangement between the     15:03:01
 9   plaintiffs, each individual plaintiff and         15:03:05
10   PharMerica, is there anything that strikes you as 15:03:07
11   to their relationship with one another directly   15:03:10
12   that presents an issue in terms of the            15:03:15
13   Anti-Kickback Statute?                            15:03:18
14       A.   Well, I mean, well, I don't think you   15:03:21
15   could look at the contract within the four        15:03:27
16   corners.  I mean, if you just looked at the four  15:03:29
17   corners of the contract and only knew that, and   15:03:30
18   that was all there was, I think -- I mean, the    15:03:33
19   natural assumption would be it would be awful.    15:03:36
20       Q.   Okay.  And I'm going to work you        15:03:39
21   through everything else, but presumptively a      15:03:42
22   Pharmacy Services Agreement is lawful unless      15:03:44
23   something else is going on?                       15:03:47
24       MR. MEYER:  Objection, form.                  15:03:48
25       THE WITNESS:  Yeah, between two               15:03:51
```

**117**

```
 1              K. McAnaney
 2       Q.   Okay.  And then what are the resulting  15:05:05
 3   referrals that you contend arose out of this      15:05:10
 4   payment?                                          15:05:15
 5       A.   Any of the business that came out of    15:05:16
 6   those SNF's, whether it was Part A, Part D.  I    15:05:21
 7   think it was a kickback for some of the           15:05:25
 8   commercial business.  I mean, it just --          15:05:28
 9   generally, a pharmaceutical business out of those 15:05:29
10   SNF's.                                            15:05:36
11       Q.   In setting forth your opinions, you     15:05:37
12   talk about what -- some terms of the PSA's that   15:05:38
13   you focused on, and one of those terms is the     15:05:42
14   term length.                                      15:05:47
15            Why is it that you have an issue with   15:05:49
16   the term length?                                  15:05:56
17       A.   Well, frankly, it's just evidence that  15:05:59
18   these were out of the ordinary contracts.  These  15:06:03
19   are outlier or lengths of term.  But, again, all  15:06:09
20   these things are just evidence of the underlying  15:06:16
21   transaction, which was the sale of that pharmacy  15:06:18
22   referral business.  But -- so the term is one     15:06:23
23   factor.  It's been indicated before.              15:06:27
24       Q.   So let me just make sure I understand   15:06:29
25   you.                                              15:06:31
```

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

## 118

```
 1                    K. McAnaney
 2          Is it fair to say that term length --  15:06:31
 3   a 10-year term length, in and of itself, doesn't  15:06:38
 4   constitute a violation of the Anti-Kickback  15:06:42
 5   Statute?                          15:06:44
 6       A.   No.                      15:06:45
 7       Q.   Are you familiar with -- you talked  15:06:46
 8   about earlier that you have some familiarity with  15:06:49
 9   Pharmacy Services Agreements.          15:06:53
10          What are the term lengths contained  15:06:57
11   within those Pharmacy Services Agreements?  15:06:59
12       A.   Well, I mean typically the ones I saw  15:07:02
13   were generally -- I think when I first started  15:07:05
14   looking at them, they were probably in the one  15:07:08
15   year length, cancelable on -- with or without  15:07:11
16   cause for, you know, 60, 90, 180 days notice.  15:07:15
17   And then I think they tended to lengthen out, and  15:07:22
18   I'd say the more recently, in the three-year,  15:07:28
19   four-year, maybe five-year.            15:07:32
20       Q.   Term length?                15:07:35
21       A.   Term lengths, again, typically --  15:07:37
22   typically the ones I'm familiar with were  15:07:40
23   cancelable, again, without cause with a certain  15:07:42
24   amount of notice.                   15:07:47
25       Q.   Okay.  So over the course of your  15:07:49
```

## 120

```
 1                    K. McAnaney
 2   something like that.                 15:09:17
 3       Q.   Is there anything that would make it  15:09:17
 4   unlawful that you're aware of for someone to have  15:09:19
 5   a PSA that's ten years in length?       15:09:22
 6       A.   No, not if all the other circumstances  15:09:26
 7   surrounding it are fine.             15:09:28
 8       Q.   Are you aware that there are, in fact,  15:09:30
 9   some long-term care pharmacies that have 15-year  15:09:33
10   PSA's?                            15:09:36
11       A.   I found that out recently.        15:09:38
12       Q.   And is there anything about a 15-year  15:09:39
13   PSA, in and of itself, that gives you pause in  15:09:42
14   terms of implications it may have on the  15:09:47
15   Anti-Kickback Statute?                15:09:49
16       A.   Well, yes.  I mean, if I came across  15:09:52
17   it, I would -- I would examine it closely.  15:09:55
18       Q.   What types of things would you  15:10:01
19   examine?                          15:10:02
20       A.   I mean, find out who the parties were.  15:10:03
21   Under what circumstances it was done.  How --  15:10:06
22   what's the reason that it's of that length.  I  15:10:08
23   mean, it's an outlier.                15:10:12
24       Q.   And maybe a good way to ask this is,  15:10:14
25   is being an outlier illegal?            15:10:17
```

## 119

```
 1                    K. McAnaney
 2   experience, term lengths have trended to be  15:07:51
 3   longer; is that correct?              15:07:55
 4       A.   I think they changed with changes in  15:07:58
 5   the Medicare law and the requirements for nursing  15:08:03
 6   homes and pharmaceutical coverage, so yes, I  15:08:08
 7   think they've tended to increase somewhat to the  15:08:13
 8   three and five-year.                 15:08:17
 9       Q.   Okay.  Just to make sure I understand  15:08:19
10   correctly, there's nothing in the Anti-Kickback  15:08:21
11   Statute that says that if you've got a PSA that's  15:08:22
12   "X" number of years, that's okay, but if you have  15:08:25
13   one that's "Y" number of years, that's a problem?  15:08:29
14       A.   That's correct.  That's not in the  15:08:34
15   Kickback Statute.                    15:08:36
16       Q.   Are you aware of Pharmacy Services  15:08:38
17   Agreements other than the ones involved in this  15:08:40
18   case that are ten years in length?      15:08:44
19       A.   I am -- I am -- I am not.  I did  15:08:49
20   notice -- I mean, I've reviewed the data supplied  15:08:54
21   by PharMerica that showed that I think that they  15:08:59
22   don't have any contracts at that length.  That  15:09:01
23   they are basically -- the bulk of their contracts  15:09:04
24   are, I think, overwhelmingly about half, under  15:09:08
25   three.  Maybe another big chunk over five;  15:09:13
```

## 121

```
 1                    K. McAnaney
 2       A.   No, not necessarily.           15:10:23
 3       Q.   In addition to term length, you talked  15:10:27
 4   also about termination provisions, and you just  15:10:32
 5   referenced a couple here.             15:10:39
 6          What do you think is unusual about the  15:10:41
 7   termination provisions contained in the PSA's  15:10:42
 8   involved in this case?                15:10:46
 9       A.   I think the combination -- it's more  15:10:47
10   the combination.  I mean, again, typically I  15:10:50
11   think termination -- the only termination for  15:10:53
12   cause in PSA's -- in the PSA's I reviewed is  15:10:56
13   relatively unusual.  I think it's the combination  15:11:01
14   of a 10-year term with how the ability to  15:11:06
15   terminate a but for clause.  And then --  15:11:10
16       Q.   I'm sorry; you find that unusual or  15:11:14
17   you find that illegal?                15:11:16
18       A.   I find that most unusual and  15:11:18
19   potentially illegal, depending on the  15:11:21
20   circumstances.                      15:11:23
21       Q.   And what about -- let me ask you this,  15:11:26
22   Mr. McAnaney.                       15:11:32
23          Is there anything wrong or unlawful  15:11:33
24   about wanting to have a long-term agreement?  15:11:34
25       A.   No, not at all.              15:11:38
```

31 (Pages 118 to 121)

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

## 122

K. McAnaney

1
2    Q.   Is there anything wrong or unlawful   15:11:39
3  about wanting to have an agreement that is   15:11:41
4  terminable only with cause?   15:11:45
5    A.   No.   15:11:48
6    Q.   In reaching your opinions, did you   15:11:57
7  have the occasion to speak to anybody who has   15:11:59
8  familiarity with negotiating PSA's in the current   15:12:08
9  market?   15:12:13
10    A.   No, not specifically.   15:12:18
11    Q.   If I were to tell you, or if someone   15:12:22
12  were to tell you that it's actually quite common   15:12:25
13  to have with cause termination provisions, would   15:12:28
14  that change your opinions in this case at all?   15:12:33
15    A.   It would -- well, no, it wouldn't   15:12:37
16  change my opinion in this case, but, again, it   15:12:40
17  would -- I mean, even so, I think it would depend   15:12:43
18  on how long the term in conjunction with the   15:12:46
19  termination provisions are, I think the most   15:12:51
20  salient factor.   15:12:57
21    Q.   And why does that matter?   15:12:58
22    A.   Because it's unusual. It's very   15:12:59
23  unusual to tie yourself in for that length of   15:13:01
24  time for a for cause, knowing what I know about   15:13:04
25  the industry. I mean, I just think that would be   15:13:08

## 123

K. McAnaney

1
2  very unusual.   15:13:11
3    Q.   If I'm a nursing home owner or   15:13:12
4  operator, and I have negotiated what I think is a   15:13:15
5  very good Pharmacy Services Agreement on my   15:13:21
6  behalf, is there anything wrong with me, as a   15:13:24
7  nursing home provider, wanting to lock that   15:13:26
8  agreement in for an extended period of time?   15:13:28
9    A.   Well, I mean, it would depend on the   15:13:33
10  circumstances. You know, if it's an arm's length   15:13:37
11  and -- I think it can be legal. I think it can   15:13:41
12  be illegal in some circumstances.   15:13:44
13    Q.   Depending on whether some form of   15:13:46
14  remuneration is paid in exchange for any   15:13:50
15  referrals that I may have?   15:13:53
16    A.   Yeah. I think it's pretty commonly   15:13:56
17  understood that nursing home operators can't   15:13:58
18  charge for a PSA. They can't receive money for a   15:14:04
19  PSA.   15:14:09
20    Q.   Okay. Who -- in the nursing home   15:14:11
21  setting, who authorizes prescriptions?   15:14:14
22    MR. MEYER: Objection, form.   15:14:22
23    THE WITNESS: Well, physicians   15:14:23
24  write prescriptions.   15:14:23
25  BY MS. MITCHELL:   15:14:24

## 124

K. McAnaney

1
2    Q.   So a nursing home operator or owner   15:14:24
3  can't write a prescription?   15:14:27
4    A.   No.   15:14:28
5    Q.   So they don't control --   15:14:29
6    A.   I don't think they can, but there may   15:14:31
7  be some -- well, there are some that are doctors,   15:14:32
8  but --   15:14:34
9    Q.   Okay. Aside from that. But A   15:14:35
10  physician is -- needs to write a prescription?   15:14:37
11    A.   Yes.   15:14:40
12    Q.   Is the prescription the actual   15:14:42
13  referral?   15:14:44
14    A.   No. Well, I mean, yes, it is.   15:14:45
15    Q.   Literally.   15:14:48
16    A.   It isn't the only referral.   15:14:50
17    Q.   And what would other referrals be?   15:14:52
18    A.   Well, I think the nursing home   15:14:55
19  entering into an exclusive agreement is very   15:14:56
20  commonly understood in the Healthcare Bar and   15:15:01
21  certainly by the Federal Government, that   15:15:05
22  hospitals can refer patients. It doesn't require   15:15:08
23  a doctor, if you basically can control or   15:15:11
24  influence substantially the referral of   15:15:16
25  healthcare business, or the awarding of services   15:15:20

## 125

K. McAnaney

1
2  that are reimbursed under that by federal   15:15:25
3  healthcare. That that is sufficient. It doesn't   15:15:27
4  have to be a referral in the sense of a doctor   15:15:30
5  writing on a prescription, you go there.   15:15:36
6    Q.   Are you familiar with the patient   15:15:39
7  choice laws in Texas?   15:15:42
8    A.   No.   15:15:43
9    Q.   Are you aware that under the Pharmacy   15:15:45
10  Services Agreements, that the patients are   15:15:47
11  actually afforded the ability to choose their   15:15:51
12  pharmacy?   15:15:56
13    A.   Yes.   15:15:57
14    MR. MEYER: Objection, form.   15:15:57
15    THE WITNESS: Yes, I am.   15:15:59
16  BY MS. MITCHELL:   15:15:59
17    Q.   Do you have an understanding as to how   15:16:02
18  many patients or residents within the plaintiffs'   15:16:05
19  nursing homes or SNF's utilize PharMerica versus   15:16:10
20  some other pharmacy?   15:16:17
21    A.   I believe I've seen an exhibit or a   15:16:21
22  document that I'm not quite sure what it shows,   15:16:25
23  but I think it has some utilization by homes at   15:16:28
24  some point in time for some basis.   15:16:37
25    Q.   If you're unsure what that document   15:16:39

VERITEXT REPORTING COMPANY

212-267-6868               516-608-2400

## 134

```
 1              K. McAnaney
 2  says that they'll do anything. They'll write    15:28:40
 3  whatever terms they want.                15:28:43
 4      Q.   Is there anything, per se, illegal   15:28:44
 5  about a -- for a nursing home chain to open and  15:28:47
 6  develop its own pharmacy?               15:28:58
 7      A.   No.                      15:29:02
 8      Q.   Is there anything, per se, illegal   15:29:03
 9  about that same nursing home owner or operator   15:29:05
10  later selling any such pharmacy?           15:29:09
11      A.   That's a good question. I think    15:29:17
12  there -- I think there might be.           15:29:20
13      Q.   So is it your opinion that it's not  15:29:24
14  possible to legally sell a captive pharmacy, to  15:29:28
15  use your language?                   15:29:33
16      A.   I'm saying it's -- I think it's     15:29:34
17  arguable whether you can do it. For more than -- 15:29:38
18  for more than the hard assets.            15:29:46
19      Q.   In the acquisition that we discussed 15:29:52
20  earlier today in connection with your work at    15:29:53
21  Dewey Ballantine, was that captive pharmacy     15:29:56
22  eventually sold?                    15:30:00
23      A.   I can't recall, but I believe it was. 15:30:02
24      Q.   Okay. Are you aware of -- with your  15:30:04
25  work in the industry, other captive pharmacies   15:30:08
```

## 135

```
 1              K. McAnaney
 2  that have been bought and sold?            15:30:10
 3      A.   Yes.                     15:30:12
 4      Q.   Okay. Were you aware of such sales  15:30:12
 5  while you were at the OIG?              15:30:17
 6      A.   Yes.                     15:30:20
 7      Q.   And at that point in time, did they  15:30:21
 8  were they investigated?               15:30:27
 9      A.   I really wasn't involved in all the  15:30:30
10  investigations. I couldn't tell you. I was not  15:30:32
11  aware of any investigations other than --       15:30:35
12      Q.   The one that we talked about earlier 15:30:39
13  today?                         15:30:41
14      A.   The one that we talked about.      15:30:41
15      Q.   Are you aware of situations where   15:30:43
16  captive pharmacies have been bought and sold    15:30:45
17  without resulting in an accusation by the      15:30:48
18  government that a violation of the Anti-Kickback 15:30:55
19  Statute occurred?                   15:30:57
20      A.   Transactions occur all the time that 15:31:01
21  don't get challenged. I don't think that says   15:31:03
22  anything, but -- so maybe the answer -- I believe 15:31:05
23  it's no. I believe it's no. I'd have to go --   15:31:11
24      Q.   Let me see if I can rephrase that.   15:31:16
25      That the purchase or sale of captive    15:31:19
```

## 136

```
 1              K. McAnaney
 2  pharmacies have occurred without incurring      15:31:21
 3  liability under the Anti-Kickback Statute, as far 15:31:25
 4  as you're aware?                    15:31:28
 5      A.   I mean, some have and some have not.  15:31:28
 6      Q.   Okay. But I'm trying to figure out  15:31:31
 7  whether they can occur.               15:31:33
 8      A.   I mean, they do occur, yes.       15:31:37
 9      Q.   Without running afoul of the      15:31:41
10  Anti-Kickback Statute?                15:31:43
11      A.   That, as I said, I think that's -- I 15:31:44
12  don't -- I mean, I don't think there's ever been 15:31:49
13  a determination.                    15:31:51
14      Q.   And circling back, I digressed a    15:32:00
15  little bit there, you are not able to tell us    15:32:02
16  what increase in value you think occurred as a   15:32:10
17  result of various changes to the PSA's in this   15:32:13
18  case?                         15:32:17
19      A.   Well, beyond what I said, which is the 15:32:19
20  facts indicate that prior to the changes, they   15:32:21
21  had no bids.                      15:32:25
22      Q.   Okay. Are you able to do -- tell me  15:32:30
23  the converse as to what PharMaster would have    15:32:38
24  been worth without the addition of these terms?  15:32:42
25      A.   Well, as I said, I can only go from -- 15:32:46
```

## 137

```
 1              K. McAnaney
 2  the evidence in the record was nobody was       15:32:48
 3  interested in buying it.                15:32:53
 4      Q.   Are you aware that the owners of     15:32:54
 5  PharMaster had reached out to Houlihan Lokey, an 15:32:58
 6  investment bank and advisor regarding the sale of 15:33:03
 7  PharMaster?                       15:33:07
 8      A.   Yes.                     15:33:08
 9      Q.   Are you aware that in their role,    15:33:08
10  Houlihan Lokey undertook a valuation of        15:33:13
11  PharMaster?                       15:33:23
12      A.   Yes.                     15:33:23
13      Q.   What do you know about that valuation? 15:33:24
14      A.   Well, let me say, I think the       15:33:26
15  testimony's a bit -- I don't think they actually 15:33:28
16  did a valuation. They seemed to distinguish     15:33:30
17  between a valuation -- they had a valuation      15:33:33
18  department, and then some calculation which they 15:33:37
19  looked at a possible sales price. So I'm not     15:33:40
20  sure that they would even call it a valuation as 15:33:43
21  I read the deposition.                15:33:46
22      Q.   Okay. Do you remember what the sale  15:33:47
23  price was that they suggested to Mr. Licari and  15:33:49
24  Mr. D'Arcangelo would be an appropriate sales    15:33:57
25  price?                         15:33:59
```

35 (Pages 134 to 137)

## 138

K. McAnaney

1
2  A.  Not specifically, but I believe it was  15:34:02
3  20 to 24 million.  22 to 24; something in that  15:34:06
4  range, I believe.                15:34:10
5  Q.  And do you remember when they conveyed  15:34:11
6  that information?                15:34:14
7  A.  Yeah, when they first -- I think it  15:34:16
8  was early on in their engagement.        15:34:20
9  Q.  Was it before -- do you know whether  15:34:23
10  it was before any terms of the PSA's were  15:34:24
11  changed?                    15:34:27
12  A.  Yes.                  15:34:28
13  Q.  And so by yes, yes it was or yes, you  15:34:31
14  know --                    15:34:34
15  A.  Yes, I know it was.            15:34:35
16  Q.  Okay.  And after the PSA's were    15:34:36
17  changed, do you know if they changed their view  15:34:40
18  on what a good price would be?        15:34:43
19  A.  I'm sorry; I'm getting confused.  Can  15:34:50
20  you read back the question?  I'm getting into was  15:34:53
21  I aware of --                15:34:58
22      (Whereupon the reporter read back  15:35:00
23      the requested portion of the record.)  15:35:00
24      THE WITNESS:  My recollection is  15:35:16
25  they did not significantly change the price.  15:35:16

## 139

K. McAnaney

1
2  BY MS. MITCHELL:              15:35:19
3  Q.  Okay.  I'm having trouble        15:35:20
4  understanding if Houlihan Lokey, an independent  15:35:21
5  third-party, says the value is 20 to 24 million,  15:35:25
6  and PharMerica later comes in and pays within  15:35:28
7  that range, why that then constitutes a violation  15:35:32
8  of the Anti-Kickback Statute?        15:35:36
9  A.  Well, because it depends on the      15:35:39
10  intent.  But the point is -- well, it depends on  15:35:41
11  the intent.  Fair market value doesn't      15:35:46
12  necessarily have anything to do with anything.  15:35:50
13  Q.  Do you have an opinion as to whether  15:35:52
14  PharMerica paid fair market value for PharMaster?  15:35:57
15  A.  Well, I think -- I assume they paid  15:35:59
16  fair market value for the referral stream that  15:36:03
17  they bought.                15:36:08
18  Q.  Explain what you mean by that.      15:36:09
19  A.  Well, I think what -- I think they    15:36:10
20  paid fair market value for a lockup of ten years  15:36:14
21  of the referrals from the 35 nursing homes.    15:36:17
22  Q.  Do you know whether PharMerica      15:36:47
23  conducted their own independent valuation of    15:36:49
24  PharMaster?                15:36:52
25  A.  I believe they did.          15:36:54

## 140

K. McAnaney

1
2  Q.  Do you know what they considered in  15:36:57
3  undertaking that valuation?          15:37:01
4  A.  Well, in the valuation specifically,  15:37:07
5  no.                    15:37:15
6  Q.  Do you know if other parties expressed  15:37:24
7  an interest in purchasing PharMaster?      15:37:28
8  A.  As a standalone company?        15:37:37
9  Q.  Yes.                  15:37:38
10  A.  Omnicare.  And I can't recall any    15:37:47
11  others that looked at it as a standalone.    15:37:50
12  Q.  Would it matter to you whether others  15:37:54
13  did look at it?                15:37:58
14  A.  I mean, not particularly.  I mean, I  15:38:01
15  don't think it affects the analysis.      15:38:04
16  Q.  Would it matter to you if other      15:38:09
17  entities offered a particular price for      15:38:11
18  PharMaster?                15:38:19
19  A.  Well, it might factor in on some    15:38:21
20  aspect of the report, but the fact that other  15:38:24
21  people might offer the same kind of price for the  15:38:29
22  same -- for locking up the same referrals doesn't  15:38:37
23  matter to me particularly.          15:38:41
24  Q.  So do you think anybody could have  15:38:44
25  purchased PharMaster without running afoul of the  15:38:46

## 141

K. McAnaney

1
2  Anti-Kickback Statute?            15:38:51
3  A.  Yes.                  15:38:54
4  Q.  What would have needed to happen?    15:38:57
5  A.  I think if someone -- if they had been  15:38:59
6  able to -- if they had sold it for the contracts  15:39:01
7  in place on January -- the original 2006      15:39:05
8  contracts in place.  I think someone could come  15:39:13
9  in and buy there, and I think that's probably a  15:39:16
10  relatively safe transaction, although as I would  15:39:20
11  say, it's arguable that they might not even do  15:39:23
12  that, be able to do that.  But one could question  15:39:27
13  that under the statute, but I think that's      15:39:31
14  probably okay.                15:39:32
15  Q.  Would it matter to you if they paid  15:39:39
16  more or less than 20.5 million dollars?      15:39:40
17  A.  I'm not sure of the question.  Buying  15:39:48
18  the 2006?                  15:39:54
19  Q.  Yes.                  15:39:55
20  A.  I mean, I don't -- I think in that    15:39:58
21  case -- I mean, it might.  I'm not quite sure.  I  15:40:00
22  mean, it might, yes.            15:40:14
23  Q.  Could somebody buy a captive pharmacy  15:40:15
24  for more than the value of the tangible assets  15:40:19
25  without implicating the Anti-Kickback Statute?  15:40:21

36  (Pages 138 to 141)

---

**154**

K. McAnaney

1
2    Do you have an understanding as to   15:58:20
3    when PharMerica an PharMaster actually began   15:58:21
4    discussing and negotiating the acquisition of   15:58:24
5    PharMaster by PharMerica?   15:58:28
6    A.   Well, yeah, I believe by the record,   15:58:32
7    that active negotiations began some time after   15:58:35
8    March 28th.  I think March 28th might have been   15:58:39
9    the kickoff.   15:58:41
10   Q.   Do you know what information   15:58:45
11   PharMerica had about PharMaster prior to   15:58:47
12   March 28th?   15:58:50
13       MR. MEYER:  Objection, form.   15:58:50
14       THE WITNESS:  Not exactly, but I   15:58:56
15   believe there was testimony by Matt Ryan   15:58:57
16   that -- I mean generally at that stage, it   15:59:00
17   was a very general description.  Number of   15:59:03
18   beds.  Annual amount of sale.  I mean, I   15:59:12
19   think he sort of discussed that when he was   15:59:14
20   first -- prior to the execution of a   15:59:16
21   Confidentiality Agreement.  It was only very   15:59:19
22   general.   15:59:22
23   BY MS. MITCHELL:   15:59:23
24   Q.   Okay.   15:59:23
25       MR. FRIEDMAN:  Standby.  The time   15:59:38

---

**155**

K. McAnaney

1
2    is 3:59.  We are going off the record.  This   15:59:39
3    will end Recording No. 3.   15:59:43
4       (Whereupon there was a brief   15:59:45
5    recess.)   15:59:46
6       MR. FRIEDMAN:  The time is 16:14:44.   16:14:44
7    We are back on the record.  This will be the   16:14:47
8    start of Recording No. 4.   16:14:49
9    BY MS. MITCHELL:   16:14:52
10   Q.   Mr. McAnaney, I believe that you   16:14:56
11   testified earlier that while you believe that the   16:14:58
12   addition of several terms to the PSA's increased   16:15:02
13   the value of the PSA's, you did not attach a   16:15:05
14   value, a particular dollar value to those   16:15:12
15   amendments to the PSA's; is that correct?   16:15:17
16   A.   That's correct.   16:15:19
17   Q.   Can you explain to me, then, what is   16:15:23
18   the basis for your opinion that I believe is   16:15:25
19   on -- roughly on Page 7 of your supplemental   16:15:31
20   report, which I will refer to as the September   16:15:35
21   report for ease of reference, where you talk   16:15:38
22   about the liquidated damages clause, and you   16:15:45
23   indicate in the report that the increase in   16:15:49
24   PharMerica's offer from 18 million to 20.5   16:15:55
25   million -- excuse me, 17 million to 20.5 million   16:16:01

---

**156**

K. McAnaney

1    was directly tied to inclusion of that provision,   16:16:06
2    that one particular provision.   16:16:11
3    A.   Can you point me to exactly where this   16:16:14
4    section you're referring?   16:16:18
5    Q.   Where liquidated damages begins on   16:16:21
6    Page 7, but let's back up without reference to   16:16:24
7    the report.   16:16:26
8    Is it your opinion that the increase   16:16:27
9    in PharMerica's offer from 17 million to 20.5   16:16:34
10   million was directly tied to the inclusion of   16:16:38
11   liquidated damages language in the PSA?   16:16:43
12   A.   They appear to be related.  Whether   16:16:51
13   it's the liquidated damages along with the   16:16:54
14   assignment clause seems to be the changes that   16:16:57
15   go from, I believe, the March -- there's a March   16:17:01
16   Letter of Intent and then there was an April   16:17:05
17   or -- there were two -- two offers that were --   16:17:09
18   numbers that were referenced.  And the only   16:17:14
19   difference that appears in the contracts are   16:17:18
20   the -- are those two provisions, which is   16:17:18
21   consistent with --   16:17:23
22   Q.   So is it your opinion that -- do you   16:17:25
23   believe that PharMerica paid 20.5 million rather   16:17:33
24   than 17 million, in your words, in exchange for   16:17:36

---

**157**

K. McAnaney

1    the inclusion of this language in the PSA's?   16:17:41
2    A.   I don't know the exact amount, but I   16:17:47
3    know they paid for the inclusion of that   16:17:49
4    language.   16:17:52
5    Q.   Why do you know that?   16:17:52
6    A.   Because -- well, because it was   16:17:54
7    required as -- as a condition precedent to   16:17:57
8    getting any money.  So it's part of the -- it's a   16:18:00
9    condition of getting the 20.5.   16:18:04
10   Q.   If PharMerica -- if the evidence were   16:18:09
11   such where PharMaster came back and said, no,   16:18:15
12   we'll take the 20.5 million dollars, but we're   16:18:18
13   not including that language, does that change   16:18:21
14   your analysis?   16:18:27
15   A.   Well, if they had done that deal and   16:18:30
16   people would have agreed to it, I think it might   16:18:34
17   affect the analysis if they hadn't changed the   16:18:38
18   agreements.   16:18:41
19   Q.   How do you know that PharMerica   16:18:41
20   wouldn't have been willing to pay 20.5 million   16:18:43
21   dollars even in the absence of the changes in   16:18:45
22   7.4?   16:18:49
23   A.   Well, I know that they required it, so   16:18:50
24   I don't know that it really matters whether they   16:18:53

---

VERITEXT REPORTING COMPANY

212-267-6868                                           516-608-2400

162

```
 1                K. McAnaney
 2      they wanted to conform it.        16:23:55
 3   BY MS. MITCHELL:                     16:23:58
 4      Q.   Whose explanation?          16:23:58
 5      A.   I believe it was in the documents    16:23:59
 6   produced.  Whether it was in the Houlihan Lokey,  16:24:03
 7   that's my recollection.  I do recollect that they  16:24:05
 8   also -- the counsel said there were two.    16:24:11
 9      Q.   I'm sorry; said there were two what?  16:24:15
10      A.   Two forms.  Two standard forms.    16:24:17
11      Q.   PharMerica's counsel?        16:24:21
12      A.   I believe it was PharMerica's counsel.  16:24:21
13      Q.   Is there anything illegal about    16:24:25
14   altering one's standard form?        16:24:27
15      A.   No.                          16:24:30
16      Q.   With regard to the liquidated damages  16:24:32
17   provision, in reaching your opinions, did you  16:24:34
18   consider testimony indicating that PharMerica  16:24:40
19   often requests liquidated -- or perhaps even  16:24:44
20   always requests liquidated damages provisions?  16:24:48
21      A.   I thought --                  16:24:51
22           MR. MEYER:  Objection, form.    16:24:52
23           THE WITNESS:  -- I recall the    16:24:53
24      testimony being as they never got it except  16:24:54
25      here, or maybe once, but --       16:24:57
```

163

```
 1                K. McAnaney
 2   BY MS. MITCHELL:                     16:24:59
 3      Q.   That, however, was not my question.    16:25:00
 4           The question is, did you consider    16:25:02
 5   testimony provided by PharMerica indicating that  16:25:05
 6   they always ask for liquidated damages    16:25:09
 7   provisions?                          16:25:12
 8           MR. MEYER:  Objection, form.    16:25:16
 9           THE WITNESS:  I mean, I read it.    16:25:17
10   BY MS. MITCHELL:                     16:25:19
11      Q.   Okay.  So you saw it?        16:25:19
12      A.   Yes.                         16:25:21
13      Q.   Okay.  And then is it your    16:25:21
14   understanding that despite asking for it, they    16:25:24
15   may not get that language included in a contract?  16:25:31
16      A.   I believe that was the testimony.    16:25:38
17      Q.   Okay.  So it's entirely possible    16:25:41
18   that -- well, in fact, based on what you've just  16:25:45
19   described as having read, it appears as though    16:25:48
20   PharMerica does, in fact, ask for a liquidated    16:25:53
21   damages provision and doesn't get it.    16:25:56
22           Is there any reason to -- for you to    16:25:59
23   conclude that that same situation would have been  16:26:03
24   applicable here?                     16:26:07
25           MR. MEYER:  Objection, form.    16:26:09
```

164

```
 1                K. McAnaney
 2           THE WITNESS:  Yes.  My        16:26:11
 3      understanding is that the testimony you're  16:26:12
 4      talking to is when they're negotiating with  16:26:18
 5      institutional -- with SNF's that they    16:26:22
 6      looking for in a PSA and nobody gives it to  16:26:24
 7      them.  And I thought the testimony was    16:26:28
 8      they've gotten it.  The only place that    16:26:30
 9      they've come close is in -- when they    16:26:32
10      purchase captives.  When they talked about  16:26:34
11      two or three recent purchases of captives.  16:26:39
12      So I didn't give it much because I    16:26:41
13      think it conforms.  I don't think anyone    16:26:43
14      would give it in an independent, in an    16:26:47
15      arrangement between two parties operating at  16:26:52
16      arm's length.                     16:26:54
17   BY MS. MITCHELL:                     16:26:55
18      Q.   In connection with the transaction    16:26:56
19   that you talked about, historical transaction in  16:26:58
20   which there was an investigation by DOJ/OIG    16:27:02
21   involving PharMerica, what -- the pharmacy at    16:27:07
22   issue, did it have a history of operations?    16:27:14
23      Q.   Do you know what the length of those    16:27:19
24                                      16:27:21
25   operations were?
```

165

```
 1                K. McAnaney
 2      A.   Not particularly long.        16:27:23
 3      Q.   And by that, what do you mean?  Days,  16:27:26
 4   months, weeks, years?                16:27:29
 5      A.   I think months.              16:27:30
 6      Q.   Do you recall how many months?    16:27:31
 7      A.   I think perhaps two, three.  I think  16:27:34
 8   it varied depending on the facility.    16:27:36
 9      Q.   Was that an important factor in the    16:27:43
10   government's case at that point?        16:27:47
11           MR. MEYER:  Objection, form.    16:27:52
12           THE WITNESS:  Well, I think it    16:27:53
13      was -- it was highly probative of the    16:27:54
14      underlying offense, so it was a good piece  16:27:58
15      of evidence.                     16:28:01
16   BY MS. MITCHELL:                     16:28:03
17      Q.   Did it matter that -- we'll go back to  16:28:05
18   that.                                16:28:17
19           In connection with your first opinion  16:28:20
20   in Exhibit-3, which in summary, they're set forth  16:28:23
21   beginning on Page 10, Opinion A, "Experienced    16:28:35
22   healthcare attorneys reviewing the arrangements  16:28:40
23   between PharMerica and PharMaster would conclude  16:28:40
24   that an -- that the arrangement violated federal  16:28:44
25   healthcare -- the federal healthcare    16:28:48
```

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

166

| | K. McAnaney | |
|---|---|---|
| 1 | K. McAnaney | |
| 2 | Anti-Kickback Statute." | 16:28:52 |
| 3 | Did I read that correctly? | 16:28:53 |
| 4 | A. Yes. | 16:28:54 |
| 5 | Q. Is that a legal opinion, Mr. McAnaney? | 16:28:55 |
| 6 | A. No. It's my opinion as to what | 16:28:58 |
| 7 | experienced healthcare counsel would if they had | 16:29:00 |
| 8 | full knowledge of the facts; what they would come | 16:29:03 |
| 9 | to. | 16:29:05 |
| 10 | Q. I'm sorry; can you say that again? | 16:29:09 |
| 11 | A. It's my opinion as to what experienced | 16:29:11 |
| 12 | legal counsel healthcare -- experienced in | 16:29:13 |
| 13 | healthcare would come to after examining this -- | 16:29:17 |
| 14 | the arrangement on all the facts. | 16:29:20 |
| 15 | Q. That they would, as a matter of law, | 16:29:29 |
| 16 | conclude that the arrangement violated the | 16:29:31 |
| 17 | federal healthcare Anti-Kickback Statute? | 16:29:35 |
| 18 | A. That they would conclude that the | 16:29:37 |
| 19 | arrangement violated the Anti-Kickback Statute. | 16:29:38 |
| 20 | Q. Which ultimately is a determination as | 16:29:41 |
| 21 | to whether a violation of law occurred? | 16:29:44 |
| 22 | A. Well, it goes -- yes, it goes to | 16:29:48 |
| 23 | scienter. Oh, S-C-I-E-N-T-E-R. | 16:29:52 |
| 24 | MR. KRUEGER: If I could ask you | 16:29:58 |
| 25 | to keep your voice up. Sometimes you trail | 16:29:59 |

167

| | K. McAnaney | |
|---|---|---|
| 1 | K. McAnaney | |
| 2 | off at the end of a sentence. Thank you. | 16:30:01 |
| 3 | THE WITNESS: Yes. | 16:30:04 |
| 4 | BY MS. MITCHELL: | 16:30:04 |
| 5 | Q. In providing -- if you had the | 16:30:05 |
| 6 | opportunity to provide this opinion at trial, | 16:30:08 |
| 7 | would you expect a jury to take your direction | 16:30:11 |
| 8 | and similarly conclude that an experienced | 16:30:18 |
| 9 | healthcare attorney would conclude that the | 16:30:21 |
| 10 | arrangements we're talking about in your report | 16:30:24 |
| 11 | would violate the federal Anti-Kickback Statute? | 16:30:26 |
| 12 | MR. MEYER: Objection, form. | 16:30:29 |
| 13 | THE WITNESS: I leave that to | 16:30:32 |
| 14 | counsel. | 16:30:33 |
| 15 | BY MS. MITCHELL: | 16:30:36 |
| 16 | Q. I'm asking you, do you think that this | 16:30:38 |
| 17 | opinion that you're rendering would direct the | 16:30:41 |
| 18 | jury as to what their conclusions should be? | 16:30:45 |
| 19 | MR. MEYER: Objection, form. | 16:30:48 |
| 20 | THE WITNESS: No, I don't think | 16:30:51 |
| 21 | so. I don't think it would be -- it would | 16:30:51 |
| 22 | be taken for what it's offered for. | 16:30:57 |
| 23 | BY MS. MITCHELL: | 16:31:00 |
| 24 | Q. In terms of developing this opinion, | 16:31:03 |
| 25 | did you speak to other healthcare attorneys? | 16:31:06 |

168

| | K. McAnaney | |
|---|---|---|
| 1 | K. McAnaney | |
| 2 | A. Specifically about this? | 16:31:11 |
| 3 | Q. Yes, specifically. | 16:31:12 |
| 4 | A. No. | 16:31:13 |
| 5 | Q. Did you conduct a survey of other | 16:31:13 |
| 6 | healthcare attorneys? | 16:31:15 |
| 7 | A. No. | 16:31:16 |
| 8 | Q. With no disrespect, Mr. McAnaney, I | 16:31:21 |
| 9 | assume that you consider yourself to be an | 16:31:23 |
| 10 | experienced healthcare attorney; is that correct? | 16:31:25 |
| 11 | A. That is correct. | 16:31:27 |
| 12 | Q. Are you familiar with other | 16:31:28 |
| 13 | experienced healthcare attorneys? | 16:31:31 |
| 14 | A. Yes. | 16:31:34 |
| 15 | Q. Do you sometimes disagree with other | 16:31:35 |
| 16 | experienced healthcare attorneys as to whether | 16:31:38 |
| 17 | something might be a violation of the | 16:31:42 |
| 18 | Anti-Kickback Statute? | 16:31:45 |
| 19 | A. Sometimes. | 16:31:49 |
| 20 | Q. Are you familiar with Attorney Jeff | 16:31:52 |
| 21 | Mittleman at Holland & Knight? | 16:31:56 |
| 22 | A. I am not. | 16:31:59 |
| 23 | Q. Did you read Mr. Mittleman's | 16:31:59 |
| 24 | deposition transcript? | 16:32:01 |
| 25 | A. I don't recall. | 16:32:05 |

169

| | K. McAnaney | |
|---|---|---|
| 1 | K. McAnaney | |
| 2 | Q. I take it from your responses to my | 16:32:09 |
| 3 | questions what your answer may be, but do you | 16:32:12 |
| 4 | have any ability to determine or evaluate from | 16:32:16 |
| 5 | your perspective whether Mr. Mittleman is an | 16:32:16 |
| 6 | experienced healthcare attorney? | 16:32:21 |
| 7 | A. I do not. | 16:32:23 |
| 8 | Q. What types of things do you think make | 16:32:24 |
| 9 | one an experienced healthcare attorney? | 16:32:26 |
| 10 | A. Well, in the fraud and abuse area, | 16:32:33 |
| 11 | it's people that have worked in the area and are | 16:32:36 |
| 12 | familiar with the guidances, the rules, the | 16:32:40 |
| 13 | regulations, the preamble, the government's | 16:32:44 |
| 14 | enforcement policies. | 16:32:47 |
| 15 | Q. Does one need to have been employed by | 16:32:50 |
| 16 | the government in order to have some expertise in | 16:32:52 |
| 17 | this area? | 16:32:58 |
| 18 | A. No. | 16:32:59 |
| 19 | Q. Are you familiar with a woman by | 16:33:02 |
| 20 | the -- an attorney by the name of Katie | 16:33:04 |
| 21 | McDermott? | 16:33:06 |
| 22 | A. I am. | 16:33:07 |
| 23 | Q. Do you consider her to be an | 16:33:07 |
| 24 | experienced healthcare attorney? | 16:33:08 |
| 25 | A. I do. | 16:33:09 |

43 (Pages 166 to 169)

---

**170**

```
 1              K. McAnaney
 2      Q.  And are you familiar with the        16:33:11
 3  gentleman sitting to my left here, Mr. --    16:33:16
 4  Attorney Thomas Crane?                        16:33:18
 5      A.  I am.                  16:33:20
 6      Q.  And do you consider Mr. Crane to be an 16:33:21
 7  experienced healthcare attorney?             16:33:23
 8      A.  I do.                  16:33:32
 9      Q.  Do you think that all experienced    16:33:33
10  healthcare attorneys would agree that the    16:33:34
11  arrangement between PharMerica and PharMaster 16:33:36
12  violated the federal Anti-Kickback Statute?  16:33:39
13      A.  No.                16:33:41
14      Q.  And, in fact, the arrangement between 16:33:48
15  PharMerica and PharMaster was reviewed by    16:33:51
16  experienced healthcare attorneys?             16:33:55
17          MR. MEYER:  Objection, form.     16:33:58
18          THE WITNESS:  Well, it's not clear 16:33:59
19  to me that it was reviewed for; A, with all  16:34:02
20  the facts presented, or by counsel           16:34:07
21  specifically with respect to the Kickback    16:34:12
22  Statute.                      16:34:14
23  BY MS. MITCHELL:                   16:34:16
24      Q.  So you don't know one way or the other 16:34:17
25  whether that review was undertaken?          16:34:18
```

**171**

```
 1              K. McAnaney
 2      A.  I did not -- I thought that the     16:34:24
 3  documents and depositions that I've seen haven't 16:34:28
 4  been entirely clear as to what it was reviewed 16:34:30
 5  for.                         16:34:33
 6      Q.  Okay.  But -- so you're not sure one 16:34:33
 7  way or the other whether experienced healthcare 16:34:36
 8  attorneys reviewed the arrangement as you've 16:34:40
 9  referred to it?                 16:34:44
10      A.  That's correct, especially with     16:34:46
11  knowledge of all of the circumstances.       16:34:48
12      Q.  If experienced healthcare counsel with 16:34:50
13  knowledge of all of the facts and circumstances 16:34:53
14  did review these transactions, would that impact 16:34:56
15  your opinion?                   16:35:02
16      A.  Well, no.  I assume that someone would 16:35:04
17  always disagree.                16:35:09
18      Q.  Do you -- are you familiar with the 16:35:15
19  work of Mr. Lichtman, Aaron Lichtman, the    16:35:27
20  plaintiffs' representative who was here      16:35:35
21  previously or earlier today?                 16:35:36
22      A.  (No response.)            16:35:37
23      Q.  And that was an inartful question.  I 16:35:39
24  apologize.                    16:35:41
25          Are you aware that Mr. Lichtman is an 16:35:42
```

**172**

```
 1              K. McAnaney
 2  attorney?                       16:35:44
 3      A.  I think I know that.  I think I know 16:35:47
 4  that.                        16:35:49
 5      Q.  This may be a short line of         16:35:51
 6  questioning based on that response.          16:35:52
 7          Are you aware that Mr. Lichtman holds 16:35:57
 8  himself out to be an expert in the area of the 16:35:58
 9  Anti-Kickback Statute?                 16:36:02
10      A.  I am not.               16:36:03
11          MR. MEYER:  Objection, form.     16:36:04
12  BY MS. MITCHELL:                   16:36:05
13      Q.  You are not?             16:36:06
14      A.  I am not.               16:36:07
15      Q.  In connection with the plaintiffs'  16:36:10
16  acquisition of the nursing homes, the SNF's in 16:36:15
17  this case, would you expect as part of that  16:36:18
18  process, that due diligence would be undertaken? 16:36:24
19      A.  Yes.                16:36:27
20      Q.  Would you expect as part of that due 16:36:30
21  diligence, that somebody would review the    16:36:30
22  Pharmacy Services Agreements?                16:36:36
23          MR. MEYER:  Objection, form.     16:36:38
24          THE WITNESS:  I would hope so.    16:36:40
25  BY MS. MITCHELL:                   16:36:41
```

**173**

```
 1              K. McAnaney
 2      Q.  As part of that review, would you    16:36:42
 3  expect someone to evaluate whether there were any 16:36:45
 4  anti-kickback issues related to the PSA's?   16:36:50
 5          MR. MEYER:  Objection, form.     16:36:55
 6          THE WITNESS:  Well, I don't -- I    16:36:57
 7  think they would have looked at the terms    16:36:59
 8  and -- I mean hopefully flagged if they      16:37:03
 9  thought there were unusual terms.            16:37:09
10  BY MS. MITCHELL:                   16:37:11
11      Q.  Okay.  Do you believe based on the   16:37:14
12  PSA's themselves, that it should have raised a 16:37:19
13  flag to someone that there was an anti-kickback 16:37:25
14  issue?                        16:37:29
15          MR. MEYER:  Objection, form.     16:37:30
16          THE WITNESS:  I think they should  16:37:32
17  have raised a flag I would have thought      16:37:33
18  there was a potential issue.                 16:37:38
19  BY MS. MITCHELL:                   16:37:40
20      Q.  And in your experience in conducting 16:37:43
21  due diligence, if somebody did not raise a flag, 16:37:45
22  would you consider that problematic?         16:37:52
23          MR. MEYER:  Objection, form.     16:37:55
24          THE WITNESS:  Having done a lot of 16:37:56
25  due diligence, things slip all the time, so  16:37:57
```

**44 (Pages 170 to 173)**

### 174

K. McAnaney

1
2  I think it would have -- I mean, I think it  16:37:59
3  would have been unfortunate.          16:38:04
4  BY MS. MITCHELL:                      16:38:05
5     Q.  Okay.  And -- in connection with  16:38:06
6  Opinion B that you offer, which I think appears  16:38:24
7  in its entirety on Page 10 as well, it reads,  16:38:28
8  "The arrangement between PharMerica and  16:38:31
9  PharMaster violated the federal healthcare  16:38:33
10 Anti-Kickback Statute."               16:38:36
11    Did I read that correctly?       16:38:37
12    A.  You did.                      16:38:39
13    Q.  Is this your legal opinion, Mr.  16:38:45
14 McAnaney?                             16:38:48
15    A.  This is my opinion based on -- as an  16:38:50
16 experienced healthcare attorney.  And, yes, it  16:38:53
17 goes to --                            16:38:58
18    Q.  The legal issue as to whether --  16:39:01
19    A.  To a conclusion, yes.         16:39:04
20    Q.  Mr. McAnaney, do you think that today  16:39:25
21 under the PSA's, a violation of the Anti-Kickback  16:39:30
22 Statute is occurring?                 16:39:34
23    A.  Yes.                          16:39:38
24    Q.  How so?                       16:39:41
25    A.  They're getting the referrals that  16:39:43

### 175

K. McAnaney

1
2  they paid for, so I think it's an ongoing scheme.  16:39:46
3  I would think under the -- based on positions the  16:39:49
4  Justice Department has taken in cases, I think  16:39:58
5  that any referrals that people get as a result of  16:40:00
6  a kickback are ongoing violations and ongoing  16:40:03
7  false claims.                        16:40:07
8     Q.  Are the plaintiffs implicated in that?  16:40:08
9     A.  No, I wouldn't think so.       16:40:10
10    Q.  And why is that?              16:40:12
11    A.  Because they're submitting the claims,  16:40:13
12 but they're not the people that have made them  16:40:16
13 false and they did not pay the kickback.  So I  16:40:19
14 don't see -- they certainly didn't violate the  16:40:22
15 Kickback Statute.  The question would be are they  16:40:25
16 submitting false claims, but they're not, because  16:40:28
17 they're not knowingly.               16:40:31
18    Q.  And I'm trying to just parse through  16:40:35
19 this as to what the actual violation that you're  16:40:37
20 contending occurred.                 16:40:40
21    And is it fair to say that the PSA's  16:40:44
22 themselves do not amount to a violation of the  16:40:53
23 Anti-Kickback Statute, but that they, in your  16:40:56
24 opinion, provide evidence of the intent -- the  16:40:59
25 alleged intent of PharMerica and PharMaster in  16:41:06

### 176

K. McAnaney

1
2  connection with the sale of PharMaster?  16:41:12
3     MR. MEYER:  Objection, form.      16:41:19
4     THE WITNESS:  I'm -- I think the  16:41:21
5  PSA's are part and parcel of the illegal  16:41:27
6  kickback scheme.  That the scheme was  16:41:32
7  basically, we'll sell you -- you'll get all  16:41:34
8  this pharmacy business, and we'll arrange  16:41:38
9  for it for a period of ten years.  And since  16:41:40
10 I can't give it to you directly, we just  16:41:45
11 launder it through PharMaster.  And if you  16:41:49
12 don't get it either way, if you don't get  16:41:54
13 all those referrals, we'll pay you back your  16:41:57
14 money.  So I think it's -- I mean, it's  16:42:01
15 got a -- if the referrals don't come, I've  16:42:04
16 got to pay you back the money because I  16:42:07
17 didn't get what I paid for from my kickback.  16:42:08
18 BY MS. MITCHELL:                      16:42:10
19    Q.  Would it be fair to analogize this  16:42:11
20 situation to PSA's being the fruit of the  16:42:14
21 poisoned tree?                       16:42:17
22    MR. MEYER:  Objection, form.      16:42:20
23    THE WITNESS:  No.  I think that  16:42:21
24 the referrals, the actual part, the claims  16:42:24
25 submission maybe are the fruit of the  16:42:30

### 177

K. McAnaney

1
2  poisonous tree.  I think the PSA's are  16:42:32
3  poisonous.  They're part and parcel of the  16:42:34
4  poisonous tree.                      16:42:37
5  BY MS. MITCHELL:                      16:42:38
6     Q.  And yet the plaintiffs are parties to  16:42:38
7  those PSA's, but they are not involved in any  16:42:41
8  type of violation of the Anti-Kickback Statute?  16:42:44
9     A.  No, because -- I mean, they didn't  16:42:47
10 sell the referrals.  I mean, they didn't get the  16:42:49
11 money, so I mean, I don't see what they did  16:42:51
12 the -- the kickback, you have to either pay or  16:42:56
13 receive the remuneration, and they haven't done  16:42:58
14 either of those.  The remuneration went to the  16:43:01
15 Pittsburg SNF prior owners, the 20.5 million, and  16:43:05
16 the referrals have gone to PharMerica.  16:43:11
17    Q.  In connection with -- is there a  16:44:04
18 difference, Mr. McAnaney, under the Anti-Kickback  16:44:08
19 Statute between should have known versus did  16:44:11
20 know, in terms of satisfying the requirements  16:44:15
21 under the Anti-Kickback Statute, the intent  16:44:19
22 requirement?                         16:44:21
23    A.  Well, yeah, under the Kickback  16:44:23
24 Statute, it has to be a knowing and willful  16:44:27
25 violation.                           16:44:30

45 (Pages 174 to 177)

### 178

K. McAnaney

```
1
2    Q.  Okay.  And what is the evidence here    16:44:31
3    in your mind of a knowing intent by PharMerica to 16:44:38
4    violate the Anti-Kickback Statute?    16:44:43
5        A.  Well, I think; A, they knew the terms 16:44:45
6    were negotiable with the owners of the SNFs.  So 16:44:50
7    they knew they were actually dealing not with 16:44:54
8    PharMaster, but also with the Pittsburg SNF's. 16:44:57
9    They knew the terms were fully negotiable.  They, 16:45:01
10   in fact, negotiated for them so that they could 16:45:04
11   be sure they were going to get those referrals 16:45:09
12   for a ten-year period of time.  And that if they 16:45:13
13   didn't, they would get their money back. 16:45:17
14       They also knew at the same time that 16:45:21
15   they had just settled with the government and 16:45:26
16   they knew the government's contention was that 16:45:29
17   extending a contract term to seven years, three 16:45:32
18   years shorter than this, was unusual and 16:45:36
19   constituted a violation, along with tying it in 16:45:40
20   with changes to the termination provision.  So -- 16:45:46
21   and they apparently -- I mean, they had a CIA in 16:45:50
22   place that required them to have training and 16:45:53
23   knowledge of the Kickback Statute, including 16:45:59
24   specific to their industry, which they had just 16:46:02
25   been involved in a major kickback, and they 16:46:06
```

### 179

K. McAnaney

```
1
2    basically were doing the same thing.    16:46:11
3        And I think finally that there's at 16:46:15
4    least -- the fact is they did not report it under 16:46:19
5    the CIA to the government.  I think they were 16:46:23
6    well aware that this was a problematic 16:46:27
7    arrangement and they went forward anyway. 16:46:32
8        And I think the law is if you take 16:46:37
9    that risk, you take that risk.  You can't go to 16:46:39
10   the edge of the line and then say, well, I 16:46:42
11   thought I was on this side, if you fall over. 16:46:44
12       Q.  Just out of curiosity, Mr. McAnaney, 16:46:48
13   is knowledge of the government's position the 16:46:50
14   same as knowledge of the law?    16:46:53
15       MR. MEYER:  Objection, form.    16:46:57
16       THE WITNESS:  I think it is -- it 16:46:59
17   is knowledge of the government's view of the 16:47:02
18   law, and so it is knowledge of a potential 16:47:06
19   view of the law.  So, yes, I think it puts 16:47:08
20   you on notice.    16:47:11
21   BY MS. MITCHELL:    16:47:11
22       Q.  Do you think that there are any 16:47:13
23   distinguishing factors between the transaction at 16:47:15
24   issue and this case, and the transaction -- the 16:47:18
25   Hollins Manor case?    16:47:23
```

### 180

K. McAnaney

```
1
2    A.  Substantively?    16:47:25
3    Q.  Yeah.    16:47:26
4    A.  No.    16:47:26
5    Q.  So no distinguishing factors 16:47:26
6    whatsoever?    16:47:29
7        MR. MEYER:  Objection, form.    16:47:31
8        THE WITNESS:  I think not of a 16:47:32
9    substantive offense.    16:47:33
10   BY MS. MITCHELL:    16:47:34
11       Q.  No substantive discriminating factors 16:47:35
12   between the two transactions?    16:47:38
13       A.  That's correct.    16:47:40
14       Q.  With regard to Opinion C, I don't 16:47:44
15   think we've done Opinion C, or did we? 16:47:51
16       A.  No.    16:47:55
17       Q.  Opinion C in your report reads, 16:47:59
18   "PharMerica" -- this is on Page 11; excuse me, 16:48:00
19   Mr. McAnaney.  "PharMerica was aware that the 16:48:04
20   arrangement between PharMaster and the Pittsburg 16:48:06
21   SNF's via the January 2008 PSA's and the 16:48:10
22   October 2008 PSA's violated the Anti-Kickback 16:48:13
23   Statute."    16:48:16
24       Did I read that correctly?    16:48:18
25       A.  Yes.    16:48:19
```

### 181

K. McAnaney

```
1
2    Q.  How is Opinion C different from 16:48:19
3    Opinion B?    16:48:22
4    A.  Well, it was specifically to 16:48:23
5    PharMaster, so -- as opposed to the 16:48:26
6    arrangement -- in a kickback arrangement, 16:48:31
7    liability is -- each side of a transaction, you 16:48:38
8    have to look at their liability separately.  And 16:48:46
9    so that's all -- C is specifically focused on 16:48:49
10   PharMerica.    16:48:54
11       Q.  Okay.  And in reading Opinion C, it 16:48:59
12   struck me that you also were saying -- and 16:49:08
13   correct me if I'm wrong -- that it's your opinion 16:49:11
14   that even if PharMerica had never come on the 16:49:15
15   scene, that there would have been a violation of 16:49:21
16   the anti-kickback -- even if PharMerica had never 16:49:25
17   come on the scene and acquired the assets of 16:49:29
18   PharMaster, that there would have been some 16:49:32
19   violation of the Anti-Kickback Statute; is that 16:49:34
20   correct?    16:49:36
21       A.  Yes, I believe so.    16:49:39
22       Q.  Okay.  Because in Opinion C, you're 16:49:41
23   talking about the arrangement between PharMaster 16:49:43
24   and the Pittsburg SNF's?    16:49:45
25       A.  I was -- my understanding of the 16:49:54
```

46 (Pages 178 to 181)

186

| 1 | K. McAnaney |
| 2 | Kickback Statute when they required the    16:55:22 |
| 3 | change in the terms.    16:55:24 |
| 4 | BY MS. MITCHELL:    16:55:25 |
| 5 | Q.    And I'm just -- I'm focusing on    16:55:25 |
| 6 | Opinion C. I'm sorry. I should have been more    16:55:28 |
| 7 | clear about that.    16:55:30 |
| 8 | And Opinion C was that PharMerica was    16:55:31 |
| 9 | aware that the arrangement between PharMaster and    16:55:34 |
| 10 | the Pittsburg SNF's via the January 2008 PSA's    16:55:38 |
| 11 | and the October PSA's violated the Anti-Kickback    16:55:41 |
| 12 | Statute.    16:55:44 |
| 13 | A.    Well, I think the October 2008 PSA's    16:55:45 |
| 14 | violated the Anti-Kickback Statute, so that's    16:55:48 |
| 15 | what I'm focusing on. I think the 2008    16:55:50 |
| 16 | clearly -- they were aware of it.    16:55:54 |
| 17 | Q.    Okay. What about the January 2008    16:55:58 |
| 18 | PSA's?    16:55:58 |
| 19 | A.    Well, I think they -- I think they --    16:56:02 |
| 20 | I mean, they were aware that they were buying a    16:56:06 |
| 21 | 10-year stream of referrals, so I think, yeah,    16:56:08 |
| 22 | that it was a negotiable term. So I think, yes,    16:56:11 |
| 23 | they should have been aware.    16:56:14 |
| 24 | Q.    And I started this line of questioning    16:56:15 |
| 25 | because I was trying to understand if these    16:56:17 |

187

| 1 | K. McAnaney |
| 2 | PSA's, independent of PharMerica's acquisition of    16:56:20 |
| 3 | PharMaster, if your opinion in Opinion C is --    16:56:25 |
| 4 | means that these PSA's independent of    16:56:31 |
| 5 | PharMerica's acquisition of PharMaster were    16:56:34 |
| 6 | violative of the Anti-Kickback Statute.    16:56:38 |
| 7 | A.    I don't think -- the PSA's themselves    16:56:42 |
| 8 | are not violative, except as part of the scheme.    16:56:44 |
| 9 | And I think they were -- there had been --    16:56:50 |
| 10 | they were violative because -- with respect to    16:56:53 |
| 11 | the prior owners of the Pittsburg SNF's before    16:57:00 |
| 12 | they had been changed and they constituted an    16:57:03 |
| 13 | offer of referrals for remuneration.    16:57:06 |
| 14 | Q.    Okay. But then you now talk about a    16:57:11 |
| 15 | scheme that would have -- by the way, I'm reading    16:57:17 |
| 16 | Opinion C, that would have been under way before    16:57:23 |
| 17 | PharMerica was involved.    16:57:27 |
| 18 | A.    Well, the offer would have been out    16:57:30 |
| 19 | there, yes.    16:57:31 |
| 20 | Q.    Okay. And the -- is it your opinion    16:57:39 |
| 21 | that the mere offer to sell PharMaster as of    16:57:43 |
| 22 | January 2008, in light of a PSA that was -- or    16:57:52 |
| 23 | PSA's that were amended in January 2008, violated    16:57:56 |
| 24 | the Anti-Kickback Statute?    16:58:00 |
| 25 | A.    As to the prior owners of the    16:58:03 |

188

| 1 | K. McAnaney |
| 2 | Pittsburg SNF's, my answer's yes.    16:58:07 |
| 3 | Q.    Because that offer to sell amounted to    16:58:12 |
| 4 | a solicitation?    16:58:15 |
| 5 | A.    Well, because I think they -- they    16:58:17 |
| 6 | solicited remuneration in exchange for the    16:58:21 |
| 7 | referral of future healthcare business.    16:58:25 |
| 8 | Q.    If that's the case, does it matter    16:58:34 |
| 9 | what they sold the -- PharMaster for?    16:58:36 |
| 10 | A.    No, not as a matter of law.    16:58:42 |
| 11 | Q.    Mr. McAnaney, do you have a view as to    16:59:08 |
| 12 | whether -- well, have you reviewed the Third    16:59:10 |
| 13 | Amended Complaint? And I apologize. You may    16:59:15 |
| 14 | have indicated as much in your appendix. Let me    16:59:18 |
| 15 | do it this way, Mr. McAnaney, 'cause --    16:59:25 |
| 16 | Do you have an understanding as to    16:59:28 |
| 17 | what the underlying claim is in this case?    16:59:30 |
| 18 | A.    Not beyond the aspect I've looked at.    16:59:40 |
| 19 | Q.    Okay. Do you have an understanding as    16:59:47 |
| 20 | to whether this case turns upon whether a    16:59:48 |
| 21 | violation of the Anti-Kickback Statute occurred?    16:59:52 |
| 22 | MR. MEYER: Objection, form.    16:59:54 |
| 23 | THE WITNESS: Well, I guess my    16:59:58 |
| 24 | understanding is it would be significant, in    17:00:01 |
| 25 | that if that were -- if the contracts were    17:00:10 |

189

| 1 | K. McAnaney |
| 2 | unlawful or in violation of public policy,    17:00:15 |
| 3 | they may be unenforceable.    17:00:21 |
| 4 | BY MS. MITCHELL:    17:00:23 |
| 5 | Q.    Okay. With regard to Opinion No. 4 or    17:00:31 |
| 6 | D, I should say, that's on Page 11, "The actions    17:00:40 |
| 7 | of PharMaster and Licari" -- I think it should    17:00:48 |
| 8 | read D'Arcangelo -- "in creating the January 2008    17:00:52 |
| 9 | PSA's, then shortly thereafter soliciting and    17:00:55 |
| 10 | receiving remuneration from PharMerica at the end    17:00:59 |
| 11 | of sale of PharMaster, among others, for the    17:01:03 |
| 12 | referral of business from Pittsburg SNF's    17:01:06 |
| 13 | violated the Anti-Kickback Statute."    17:01:06 |
| 14 | How is that opinion different than    17:01:08 |
| 15 | Opinion C?    17:01:10 |
| 16 | A.    That focuses on the -- the prior    17:01:12 |
| 17 | owners of the Pittsburg SNF, their liability. As    17:01:18 |
| 18 | I said, you look at each act of liability    17:01:23 |
| 19 | separately.    17:01:29 |
| 20 | Q.    Okay. Perhaps my confusion comes    17:01:35 |
| 21 | because in talking about your Opinion C, we've    17:01:38 |
| 22 | talked a lot about the actions of the PharMaster    17:01:41 |
| 23 | folks, so I'm trying to distinguish between those    17:01:47 |
| 24 | two.    17:01:54 |
| 25 | MR. MEYER: Objection, form.    17:02:01 |

48  (Pages 186 to 189)

190

```
 1                    K. McAnaney
 2         THE WITNESS: I'm not sure what   17:02:05
 3    the question is.                17:02:06
 4    BY MS. MITCHELL:                17:02:07
 5         Q.   Okay.  We took Opinion C in two parts,   17:02:08
 6    and you spent some time explaining to me your   17:02:12
 7    view as to why the January 2008 PSA's and the   17:02:15
 8    October 2008 PSA's were an issue.      17:02:20
 9         So in connection with Opinion C, if   17:02:23
10    you're focusing on PharMerica's involvement, is   17:02:27
11    your opinion there that PharMerica basically was   17:02:31
12    aware of what you're then talking about in   17:02:38
13    Opinion D?                      17:02:41
14         A.   Well, I don't think they probably were   17:02:46
15    aware of everything that was in -- that goes into   17:02:49
16    my conclusion as to Appendix -- to Opinion D.   17:02:52
17         Q.   Okay.                  17:02:57
18         A.   But they were aware of enough.   17:02:59
19    should probably have flipped the two.    17:03:01
20         Q.   Okay.  I understand what you've done   17:03:03
21    now.                          17:03:05
22         And I'm not sure I asked you this, Mr.   17:03:11
23    McAnaney, but in connection with Opinion C, is   17:03:14
24    that a legal opinion?              17:03:19
25         MR. MEYER: Objection, form.  And   17:03:20
```

191

```
 1                    K. McAnaney
 2    to the extent that Ms. Mitchell, which I   17:03:22
 3    know she asked the question prior as to A   17:03:23
 4    and B, I object to the form of those   17:03:27
 5    questions.  I don't recall whether or not I   17:03:29
 6    did, but I'm asserting an objection.  Go   17:03:31
 7    ahead and answer.                17:03:33
 8         THE WITNESS: I'm sorry.  Could   17:03:34
 9    you re --                      17:03:35
10    BY MS. MITCHELL:                 17:03:36
11         Q.   Sure.  With regard to your Opinion   17:03:37
12    C --                          17:03:40
13         A.   Yes.                  17:03:42
14         Q.   -- is that a legal opinion?   17:03:42
15         MR. MEYER: Objection, form.   17:03:44
16         THE WITNESS: I think it says -- I   17:03:44
17    mean, it is what it is.            17:03:46
18    BY MS. MITCHELL:                 17:03:47
19         Q.   Okay.  And it's that PharMerica was   17:03:50
20    aware of the existence of a violation of the   17:03:58
21    Anti-Kickback Statute?             17:04:01
22         A.   Right.                17:04:03
23         Q.   Okay.  So you believe that PharMerica   17:04:03
24    was aware of an alleged violation of law.   17:04:07
25    With regard to Opinion D, you talk   17:04:17
```

192

```
 1                    K. McAnaney
 2    about the actions of a group of people, and that   17:04:20
 3    those actions amount to a violation of the   17:04:26
 4    Anti-Kickback Statute.  Is that a legal opinion?   17:04:31
 5         MR. MEYER: Objection, form.   17:04:35
 6         THE WITNESS: In part, yes, that's   17:04:46
 7    my expert opinion.                17:04:47
 8    BY MS. MITCHELL:                 17:04:49
 9         Q.   I need a few minutes because I may   17:05:17
10    have covered -- Mr. McAnaney, do you have any   17:05:19
11    involvement or experience with owning nursing   17:05:34
12    homes?                        17:05:38
13         A.   No.                   17:05:39
14         Q.   Do you have any experience in   17:05:40
15    operating nursing homes?           17:05:42
16         A.   No.                   17:05:43
17         Q.   You talk on Page 13 of your report in   17:06:07
18    the very last paragraph, you talk about what   17:06:12
19    we've referred to here as the Hollins Manor   17:06:17
20    transaction?                   17:06:20
21         A.   Yes.                  17:06:21
22         Q.   And you reference pricing provisions.   17:06:31
23         A.   Yes.                  17:06:37
24         Q.   What do you know about those pricing   17:06:38
25    provisions?                    17:06:39
```

193

```
 1                    K. McAnaney
 2         A.   In that case?           17:06:45
 3         Q.   Yes, in that case.        17:06:46
 4         A.   Only that I believe they were   17:06:49
 5    referenced by the IG.              17:06:51
 6         Q.   Okay.  Do you know anything about   17:06:54
 7    those pricing provisions, other than the fact   17:06:58
 8    that pricing provisions generically were   17:07:01
 9    referenced by -- I'm sorry, did you say OIG?   17:07:05
10         A.   I believe so.  I don't have the   17:07:08
11    documents here.  I believe that the government   17:07:12
12    said they were more favorable -- they were   17:07:17
13    favorable pricing provisions.  More favorable to   17:07:21
14    the Hollins Manor institutional pharmacy.   17:07:24
15         Q.   Is there anything illegal about having   17:07:30
16    pricing provisions that are more favorable to one   17:07:32
17    party than the other?              17:07:35
18         A.   Well, no.  I think that -- I mean, by   17:07:38
19    themselves, I think if it's, again, in   17:07:40
20    contemplation of a sale by a captive, I think   17:07:43
21    that's -- that is some evidence that -- what's   17:07:47
22    really being sold in the referrals.     17:07:59
23         Q.   So there's nothing inherently illegal   17:08:01
24    about a pricing provision.  It just might be   17:08:03
25    something that you look to?         17:08:06
```

49 (Pages 190 to 193)

218

K. McAnaney

1  OIG decided to send a letter out, did you consult  17:52:18
2  with OIG with respect to the letter, if you  17:52:22
3  recall?  17:52:24
4  A.  I don't -- I don't actually think I  17:52:28
5  was there when the letter went out.  I don't  17:52:30
6  know.  Actually, I didn't look at the date of the  17:52:33
7  letter.  I think that was after I left.  17:52:35
8  Q.  Do you know -- so you were there  17:52:37
9  certainly during the time that the claim was  17:52:40
10  being evaluated?  17:52:42
11  A.  Well, I think I was there at the  17:52:43
12  beginning of what I would say was the OIG  17:52:45
13  investigation.  17:52:47
14  Q.  And, ultimately, do you recall that a  17:52:49
15  settlement was reached, and as part of that  17:52:55
16  settlement, there was a CIA?  17:52:58
17  A.  Yes, I understand that.  17:53:01
18  Q.  And do you also -- what are CMP's?  I  17:53:03
19  think you testified about CMP's in your earlier  17:53:07
20  testimony.  17:53:10
21  A.  CMP stands for civil money penalty.  17:53:10
22  Q.  And do you recall whether or not a  17:53:13
23  CMP, civil monetary penalties, were sought  17:53:15
24  against PharMerica?  17:53:19

219

K. McAnaney

1  A.  I believe that the government sought  17:53:22
2  both civil money penalties and exclusion.  17:53:25
3  Q.  An exclusion is exclusion from the  17:53:31
4  Medicare program?  17:53:33
5  A.  I think it's all federal healthcare  17:53:34
6  programs.  17:53:36
7  Q.  All federal healthcare.  So then for a  17:53:36
8  company involved in the healthcare industry, is  17:53:40
9  it fair to say that exclusion is effectively  17:53:42
10  capital punishment?  17:53:45
11  A.  I think that's fair to say.  17:53:47
12  Q.  Okay.  So then PharMerica's existence  17:53:48
13  was threatened by this particular proceeding?  17:53:51
14  A.  Any proceeding involving fraudulent or  17:53:57
15  illegal conduct with respect to a federal  17:54:01
16  healthcare program pretty much triggers potential  17:54:04
17  for exclusion.  17:54:07
18  Q.  And at the end of the day, I  17:54:08
19  understand that there was a settlement reached  17:54:13
20  rather than an adjudicated determination; is that  17:54:17
21  correct?  17:54:21
22  A.  That's correct.  17:54:21
23  Q.  And in the settlement, am I also  17:54:22
24  correct that PharMerica did not make an admission  17:54:25

220

K. McAnaney

1  of liability?  17:54:28
2  A.  That's correct.  Actually, I assume  17:54:29
3  that's correct.  I'm not sure I've actually seen  17:54:32
4  this settlement, but I would expect that to be  17:54:35
5  the case.  17:54:38
6  Q.  Now I know that you've made a FOIA  17:54:39
7  request with regard to this matter, the Hollins  17:54:42
8  matter; correct?  17:54:45
9  A.  Yes.  17:54:47
10  Q.  Why was it -- you knew of the  17:54:47
11  existence of that earlier because you had  17:54:53
12  been involved in that earlier; correct?  17:54:55
13  A.  Correct.  17:54:58
14  Q.  And that involvement commenced with  17:54:58
15  communications with the DOJ, and continued with  17:55:00
16  discussions with the ACRB; correct?  17:55:05
17  A.  Correct.  17:55:09
18  Q.  And would you, if you can, can you  17:55:10
19  recall approximately how many discussions you had  17:55:12
20  in totality with the Department of Justice and  17:55:15
21  colleagues at OIG?  17:55:18
22  A.  No.  I mean, Justice, probably one or  17:55:22
23  two.  And OIG, I don't recall.  I mean, I saw the  17:55:26
24  people every day.  17:55:35

221

K. McAnaney

1  Q.  So you might have a lot of informal  17:55:36
2  discussions that wouldn't be significant because  17:55:38
3  they may be in the hallway or things of that  17:55:43
4  nature?  17:55:44
5  A.  Right.  And I think as I said, it was  17:55:44
6  the beginning of the -- the decision was being  17:55:46
7  made whether to investigate it.  17:55:50
8  Q.  In rendering your opinions in this  17:55:55
9  case that you've been asked about, and I'm going  17:55:56
10  to ask you more questions, but in rendering your  17:55:58
11  opinions in this case, how much weight did you  17:56:00
12  put on your knowledge of the proceedings in  17:56:10
13  connection with the PharMerica/Hollins Manor  17:56:14
14  transaction?  17:56:17
15  MR. MEYER:  Objection, form.  17:56:19
16  THE WITNESS:  Not much beyond what  17:56:23
17  the public settlement was.  17:56:24
18  BY MR. KRUEGER:  17:56:26
19  Q.  So you say "not much beyond."  17:56:26
20  A.  Well, I mean not beyond.  17:56:29
21  Q.  Well, I think you testified in  17:56:32
22  response to earlier questions that there have not  17:56:35
23  been a lot of cases brought against pharmacy  17:56:37
24  companies; is that correct?  17:56:41

56 (Pages 218 to 221)

### 222

K. McAnaney

2  A.  No.  I would say there have been many  17:56:44
3  cases brought against -- oh, pharmacy.  17:56:47
4  Q.  I'm talking about Anti-Kickback  17:56:51
5  Statute cases.  17:56:51
6  A.  I'm blanking for a minute.  I'm not  17:56:53
7  aware of many cases against institutional  17:56:58
8  pharmacies, although they appear to be  17:57:04
9  increasing.  17:57:07
10  Q.  But there have not been a large number  17:57:08
11  of those cases; correct?  17:57:10
12  MR. MEYER:  Objection, form.  17:57:12
13  THE WITNESS:  There have not been  17:57:13
14  many kickback cases at all.  17:57:13
15  BY MR. KRUEGER:  17:57:15
16  Q.  And so -- and when I'm talking about  17:57:16
17  cases, I'm talking about whether it's a  17:57:18
18  proceeding brought by the OIG of the type you're  17:57:19
19  describing, or a more formal Complaint filed in  17:57:22
20  court.  17:57:25
21  Other than the PharMerica/Hollins  17:57:27
22  Manor case, what other cases are you aware of  17:57:31
23  against institutional pharmacies?  17:57:35
24  A.  Well, I think there are cases --  17:57:38
25  Q.  I'm talking about --  17:57:47

### 223

K. McAnaney

2  A.  Johnson & Johnson and Omnicare has had  17:57:48
3  a fair number of cases.  17:57:55
4  Q.  I'm talking about really cases  17:57:56
5  involving the sale of an institutional pharmacy.  17:57:58
6  Not other things that may come up in the context  17:58:00
7  of a pharmacy case.  17:58:04
8  A.  Well, I'm aware of Hollins Manor.  And  17:58:07
9  then there's an Omnicare case that I'm aware of  17:58:12
10  that apparently just settled.  Eshoff or  17:58:18
11  something like that that apparently --  17:58:24
12  Q.  Is that the case involving Mariner and  17:58:25
13  Ruby Schron?  17:58:28
14  A.  No, this is a case -- the allegation  17:58:30
15  is actually -- one of the owners of the  17:58:35
16  institutional pharmacy was the son of an owner of  17:58:39
17  SNF's.  It was Omnicare and -- I think it was  17:58:44
18  Eshoff or something like that, but it settled.  17:58:48
19  They announced the settlement in the paper  17:58:52
20  apparently several weeks ago, but it hasn't --  17:58:57
21  the court hasn't --  17:59:03
22  Q.  Is that the Nehls case, N-E-H-L-S?  I  17:59:05
23  think it's up in Indiana or something like that?  17:59:11
24  Minnesota?  17:59:12
25  A.  Yes.  It's Nehls and there's  17:59:13

### 224

K. McAnaney

2  another -- yes.  So there's that case, and that's  17:59:15
3  the only other one I know that exactly involves  17:59:25
4  the sale of a captive.  17:59:29
5  Q.  So when we talk about the sale of an  17:59:30
6  institutional pharmacy or captive, the cases that  17:59:32
7  you can think of today are the Hollins  17:59:34
8  Manor/PharMerica case.  This Nehls, N-E-H-L-S,  17:59:37
9  case.  17:59:41
10  And are you aware of a case involving  17:59:44
11  Ruby Schron and Omnicare and Mariner?  17:59:47
12  A.  No.  17:59:51
13  Q.  So there are two cases you're aware of  17:59:52
14  that involve the sale of an institutional  17:59:54
15  pharmacy; correct?  17:59:56
16  A.  Captive institution.  17:59:57
17  Q.  Captive.  And only two?  17:59:58
18  A.  That's correct.  18:00:00
19  Q.  And you were involved in one of them?  18:00:01
20  A.  Yes.  18:00:03
21  Q.  And so that gave you a fairly unique  18:00:04
22  background; is that fair to say?  18:00:12
23  A.  Well, it gave me a prior experience in  18:00:16
24  evaluating this kind of a transaction.  18:00:22
25  Q.  And so how did you use that prior  18:00:25

### 225

K. McAnaney

2  experience in evaluating this transaction?  18:00:27
3  A.  Well, the same way I did in that.  I  18:00:30
4  know the general principles of the Kickback  18:00:32
5  Statute.  And I understand that in that, the  18:00:34
6  allegation in the settlement was -- it was being  18:00:41
7  negotiated in contemplation of sale, and putting  18:00:43
8  in favorable -- very favorable terms to the  18:00:48
9  pharm -- to the institutional pharmacy in  18:00:52
10  contemplation of the sale.  18:00:57
11  Q.  And when you rendered your opinions,  18:01:02
12  were you able -- well, let me rephrase that.  18:01:15
13  When you rendered your opinions in  18:01:19
14  this case, you relied, I take it, on that  18:01:20
15  background and knowledge that you've just  18:01:23
16  described?  18:01:25
17  A.  The opinions are based -- these are  18:01:27
18  not particular -- the arrangement is not  18:01:29
19  particular to institutional pharmacies -- the  18:01:35
20  violation.  18:01:40
21  Q.  I understand.  I'm trying to get at  18:01:43
22  is, it sounds like you're aware of two cases  18:01:45
23  involving the sale of a captive institutional  18:01:49
24  pharmacy.  You're involved with one of them.  18:01:51
25  Is it fair to say that that knowledge  18:01:54

VERITEXT REPORTING COMPANY

212-267-6868                                                            516-608-2400

238

```
 1              K. McAnaney
 2   which is infused with the determination as to the   18:14:36
 3   party's intent; is that right?          18:14:40
 4          MR. MEYER: Objection, form.      18:14:42
 5          THE WITNESS: I'm not -- I'm not   18:14:43
 6   sure I understand.                      18:14:45
 7   BY MR. KRUEGER:                         18:14:46
 8      Q.   Let me try to rephrase that.    18:14:47
 9          If, in fact, an AKS -- there's no, per  18:14:49
10   se, violation, whether there's an actual   18:14:50
11   violation turns on whether there is intent which  18:14:55
12   has been found towards this; correct?   18:14:58
13      A.   That is one of the elements that must  18:15:01
14   be found.                               18:15:04
15      Q.   Right. Right. And there are others,  18:15:06
16   I understand that, but I'm focusing on the intent  18:15:07
17   issue.                                  18:15:11
18      A.   Is it possible to take a quick break?  18:15:11
19      Q.   Sure.                           18:15:13
20          MR. FRIEDMAN: Standby. The time is  18:15:15
21   is 6:14. We're going off the record.    18:15:18
22          (Whereupon there was a brief      18:15:27
23   recess.)                                18:15:28
24          MR. FRIEDMAN: The time is 6:20.   18:21:12
25   We are back on the record.              18:21:16
```

239

```
 1              K. McAnaney
 2   BY MR. KRUEGER:                         18:21:18
 3      Q.   So in terms of an OIG Advisory   18:21:19
 4   Opinion, one of the things that we were talking  18:21:22
 5   about before the break was that the OIG will not  18:21:24
 6   issue an opinion with respect to the party's  18:21:27
 7   intent as it relates to an element of an AKS  18:21:29
 8   violation; correct?                     18:21:34
 9      A.   That's correct.                 18:21:35
10      Q.   And so then what I was starting to ask  18:21:36
11   you before the break, I understand there's not --  18:21:42
12   there are no per se violations of the AKS;  18:21:45
13   correct?                                18:21:48
14      A.   That's correct.                 18:21:48
15      Q.   And so any violation which is found to  18:21:49
16   exist has to include a finding of intentional  18:21:54
17   conduct; correct?                       18:21:58
18      A.   Correct.                        18:21:59
19      Q.   And when we speak about intent in the  18:22:00
20   context of an AKS violation, it's the intent to  18:22:02
21   do what?                                18:22:05
22      A.   That's a good question. I think the  18:22:09
23   government -- the government's position is you  18:22:11
24   have to just knowingly intend to do the act. So  18:22:14
25   knowingly intend to pay the remuneration, or to  18:22:17
```

240

```
 1              K. McAnaney
 2   get referrals, and know that that's against the  18:22:21
 3   law. I think that's probably -- you have to  18:22:27
 4   both -- I mean, I think the -- the general is you  18:22:32
 5   have to know that -- know that you're doing a bad  18:22:42
 6   act and doing it anyway.                18:22:53
 7      Q.   Purposely. And you spoke about  18:22:55
 8   scienter, S-C-I-E-N-T-E-R, earlier; correct?  18:23:00
 9      A.   Yes.                           18:23:01
10      Q.   And so that means really, as I   18:23:02
11   understand it, the willful and knowing violation  18:23:03
12   of a statute; correct?                  18:23:07
13      A.   Well, no. I think that there's -- I  18:23:10
14   think it has to be an unlawful act. It's not  18:23:13
15   quite -- at least generally it seems to me the  18:23:17
16   cases are a little vague on that.       18:23:20
17      Q.   What I was asking, you said the  18:23:23
18   government's position is. My question is, what  18:23:25
19   do you understand -- what was your position. In  18:23:28
20   order to violate the AKS, does a party have to  18:23:30
21   commit a willful and knowing act?       18:23:34
22      A.   They have to -- they have to engage in  18:23:38
23   an act that they know is unlawful.      18:23:41
24      Q.   So they have to purposely and  18:23:47
25   intentionally engage in prohibited conduct?  18:23:49
```

241

```
 1              K. McAnaney
 2          MR. MEYER: Objection, form.      18:23:52
 3          THE WITNESS: They have to        18:23:53
 4   knowingly engage in unlawful conduct.   18:23:55
 5   BY MR. KRUEGER:                         18:23:56
 6      Q.   And in issuing Advisory Opinions, OIG  18:23:56
 7   does not opine on that issue; correct?  18:24:02
 8      A.   That's correct.                 18:24:10
 9      Q.   And I might have asked you this, but  18:24:11
10   why is that OIG does not opine on that?  18:24:16
11          MR. MEYER: Objection, form.      18:24:20
12          THE WITNESS: Because the process  18:24:21
13   doesn't -- is not amenable to it. They   18:24:22
14   don't do investigations.                18:24:29
15   BY MR. KRUEGER:                         18:24:30
16      Q.   So what do they do?             18:24:30
17      A.   The Advisory Opinion process is they  18:24:32
18   basically review typically a proposed arrangement  18:24:35
19   that's described and represented to be true and  18:24:50
20   accurate that the requester wants an opinion on.  18:24:52
21   So they basically accept whatever the facts are  18:24:58
22   given to them as being true and accurate with  18:25:02
23   some exceptions.                        18:25:09
24      Q.   So they effectively accept the facts  18:25:10
25   that the requester has put before them; correct?  18:25:14
```

61 (Pages 238 to 241)

290

K. McAnaney

1  
2  expertise in determining the intent of parties  19:28:35  
3  which are superior to the expertise that a jury  19:28:38  
4  has?  19:28:41  
5      MR. MEYER: Objection. Can  19:28:42  
6  you repeat the question, George, or can you  19:29:01  
7  read the question back, please?  19:29:03  
8      (Whereupon the reporter read back  19:29:04  
9  the requested portion of the record.)  19:29:04  
10     THE WITNESS: I'm more familiar  19:29:19  
11 with the transactions and the industry, and  19:29:19  
12 so in that extent, I may have.  19:29:23  
13 BY MR. KRUEGER:  19:29:25  
14     Q.  So when a jury will be presented with  19:29:26  
15 all the facts, it's your view that you have  19:29:30  
16 superior knowledge to them in determining what  19:29:34  
17 actually happened?  19:29:37  
18     MR. MEYER: Objection, form.  19:29:38  
19     THE WITNESS: That's not what I  19:29:39  
20 said.  19:29:40  
21 BY MR. KRUEGER:  19:29:40  
22     Q.  I thought you said you may have  19:29:42  
23 superior knowledge because of your background and  19:29:43  
24 knowledge of the facts.  19:29:46  
25     A.  I may have superior insight into a  19:29:48  

---

291

K. McAnaney

1  
2  party's intent.  19:29:50  
3      Q.  Now did you consider any exculpatory  19:29:56  
4  facts in reaching the conclusion that some of the  19:30:00  
5  people sitting around this table have committed a  19:30:02  
6  violation of the AKS?  19:30:05  
7      MR. MEYER: Objection, form.  19:30:06  
8      THE WITNESS: Yes.  19:30:08  
9  BY MR. KRUEGER:  19:30:08  
10     Q.  What were the exculpatory facts you  19:30:09  
11 considered?  19:30:11  
12     A.  Well, the statements about regulatory  19:30:14  
13 compliance. The -- I mean, I'm familiar with the  19:30:16  
14 arguments that it was patient choice. I'm  19:30:23  
15 familiar with the argument that the price didn't  19:30:25  
16 change.  19:30:27  
17     Q.  What other facts did you consider that  19:30:32  
18 were exculpatory?  19:30:34  
19     A.  I can't recall. Whatever were in  19:30:36  
20 there, I took into account in making my  19:30:38  
21 evaluation.  19:30:42  
22     Q.  Well, are all the facts that you  19:30:47  
23 relied upon set forth in your opinion? Your  19:30:49  
24 three opinions, actually?  19:30:52  
25     A.  I think so.  19:31:08  

---

292

K. McAnaney

1  
2      MR. MEYER: George, can we take a  19:31:20  
3  quick break, please?  19:31:21  
4      MR. KRUEGER: Sure.  19:31:22  
5      MR. FRIEDMAN: Standby. The time  19:31:23  
6  is 7:30. We're going off the record.  19:31:24  
7      (Whereupon there was a brief  19:31:30  
8  recess.)  19:31:32  
9      MR. FRIEDMAN: The time is 7:35.  19:35:52  
10 We are back on the record.  19:35:54  
11 BY MR. KRUEGER:  19:35:55  
12     Q.  We were speaking before the break  19:35:59  
13 about juries and the ability of a jury to  19:36:01  
14 determine the facts as the finder of fact.  19:36:05  
15 There's a jury charge that you may not be  19:36:09  
16 familiar with, but it's a Latin phrase, something  19:36:13  
17 like "falsus in unum, falsus in omnibus," which  19:36:18  
18 means basically if the jury finds someone  19:36:23  
19 testified falsely in one area, they can if they  19:36:25  
20 want find that the person testified falsely in  19:36:27  
21 every other area.  19:36:29  
22     Are you familiar with that?  19:36:31  
23     A.  Not particularly.  19:36:33  
24     Q.  But is it fair to say that that's a  19:36:34  
25 common sense understanding of credibility, that  19:36:36  

---

293

K. McAnaney

1  
2  if you find someone lacks credibility in one  19:36:39  
3  area, you may conclude they lack credibility in  19:36:43  
4  other areas as well; correct?  19:36:47  
5      MR. MEYER: Objection, form.  19:36:48  
6      THE WITNESS: I think someone  19:36:49  
7  could find that.  19:36:50  
8  BY MR. KRUEGER:  19:36:50  
9      Q.  So in terms of exculpatory evidence  19:36:51  
10 that you focused on or didn't focus on, I know  19:36:54  
11 that you concluded that the defendants had the  19:36:57  
12 intent and the third-party defendants to commit a  19:37:01  
13 felony.  19:37:03  
14     Have you focused at all on the  19:37:06  
15 plaintiffs' conduct in terms of the purchase and  19:37:08  
16 sale and how the defendants reacted to what they  19:37:10  
17 did?  19:37:13  
18     A.  No.  19:37:14  
19     Q.  You read Barry Sweet's testimony?  19:37:16  
20     A.  As I said, I read it, paid attention  19:37:19  
21 to parts of it, and didn't pay much attention to  19:37:26  
22 parts of it.  19:37:26  
23     Q.  Do you recall his testimony, that he  19:37:27  
24 felt that a structure that was proposed by the  19:37:28  
25 plaintiffs involving a return of AR would likely  19:37:32  

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

## 294

K. McAnaney

1
2 constitute bank fraud?                      19:37:39
3    A.   I recalled testimony about the      19:37:44
4 structure of the agreement, and a concern that   19:37:49
5 potentially it might.                       19:37:53
6    Q.   It could be viewed as bank fraud;   19:37:56
7 correct?                                    19:37:57
8       MR. MEYER: Objection, form.           19:37:57
9       THE WITNESS: I don't know that it     19:37:59
10 could. I didn't pay much attention. I       19:37:59
11 think someone raised it as potentially it   19:38:02
12 could be.                                   19:38:05
13 BY MR. KRUEGER:                             19:38:06
14    Q.   And did you also read the testimony of   19:38:07
15 Matt Ryan and Patrick Hurst at Houlihan?    19:38:08
16    A.   I did.                             19:38:12
17    Q.   And do you recall if they testified   19:38:13
18 about that same topic?                      19:38:14
19    A.   No.                               19:38:16
20    Q.   Okay. Now you understand, of course,   19:38:17
21 that the sellers of PharMaster wanted to sell the   19:38:19
22 business; correct? It was a business goal that   19:38:22
23 they had at that time to sell their business;   19:38:26
24 correct?                                    19:38:27
25    A.   It was a business --              19:38:29

## 295

K. McAnaney

1
2    Q.   Goal that they had at that time to   19:38:30
3 sell their pharmacy business; right?        19:38:32
4    A.   Yes.                               19:38:33
5    Q.   And they also had a goal later than   19:38:34
6 that to sell their -- to sell the SNF business;   19:38:36
7 correct?                                    19:38:42
8    A.   I think -- I don't think it was early   19:38:42
9 or later. I think they were trying to sell at   19:38:46
10 all times.                                  19:38:49
11    Q.   And do you recall that the sellers   19:38:50
12 terminated the Letter of Intent with the buyers   19:38:54
13 because they were concerned that what the buyers   19:38:59
14 were doing in terms of the transaction would   19:39:03
15 constitute bank fraud?                      19:39:05
16       MR. MEYER: Objection, form.           19:39:07
17       THE WITNESS: No, I'm not aware.       19:39:08
18 BY MR. KRUEGER:                             19:39:09
19    Q.   You don't recall that testimony?    19:39:12
20    A.   No, I didn't. It's probably what I   19:39:14
21 skipped.                                    19:39:18
22    Q.   You skipped that?                  19:39:19
23    A.   I skipped virtually everything dealing   19:39:19
24 with the subsequent purchase. I think I've said   19:39:22
25 that several times.                         19:39:24

## 296

K. McAnaney

1
2    Q.   So then do you think the fact that the   19:39:25
3 sellers refused and demonstrably refused to   19:39:28
4 participate in what they thought was a bank fraud   19:39:35
5 speaks to their credibility -- speaks to their   19:39:39
6 exculpatory conduct in connection with the AKS?   19:39:42
7       MR. MEYER: Objection, form.           19:39:45
8       THE WITNESS: No, not necessarily.      19:39:47
9 BY MR. KRUEGER:                             19:39:48
10    Q.   No?                               19:39:49
11       Do you think the fact that the        19:39:49
12 plaintiffs proposed a structure that constituted   19:39:51
13 bank fraud speaks to their credibility?     19:39:55
14    A.   I don't know that they did.        19:39:57
15       MR. MEYER: Objection, form. Go       19:39:58
16 ahead.                                      19:40:01
17       THE WITNESS: I don't know that       19:40:02
18 they did.                                   19:40:02
19 BY MR. KRUEGER:                             19:40:03
20    Q.   Do you recall statements that the   19:40:04
21 buyers were looking to purchase cash with   19:40:07
22 borrowed money?                             19:40:10
23       MR. MEYER: Objection, form.           19:40:12
24       THE WITNESS: No.                     19:40:13
25 BY MR. KRUEGER:                             19:40:13

## 297

K. McAnaney

1
2    Q.   Since you skipped over that part of   19:40:17
3 the testimony, does it cause you at all to   19:40:18
4 re-think your opinions to know that the sellers   19:40:23
5 withdrew from the transaction because they were   19:40:28
6 concerned that the transaction could be seen as   19:40:31
7 bank fraud?                                 19:40:34
8       MR. MEYER: Objection, form.           19:40:35
9       THE WITNESS: Not particularly.        19:40:36
10 BY MR. KRUEGER:                             19:40:37
11    Q.   That doesn't bear, you think, on their   19:40:38
12 credibility?                                19:40:40
13       MR. MEYER: Objection, form.           19:40:42
14       THE WITNESS: It's some evidence,      19:40:43
15 yes.                                        19:40:44
16 BY MR. KRUEGER:                             19:40:44
17    Q.   It's exculpatory evidence; correct?   19:40:45
18       MR. MEYER: Objection, form.           19:40:47
19       THE WITNESS: I need to know more      19:40:49
20 about it. Potentially it could be.          19:40:50
21 BY MR. KRUEGER:                             19:40:54
22    Q.   Now at the time the -- after the sale   19:41:18
23 of PharMaster, we know that the sellers continued   19:41:23
24 to operate the SNF's for about eight or ten   19:41:28
25 months; correct?                            19:41:30

75 (Pages 294 to 297)

## 310

K. McAnaney

1
2      MR. MEYER:  Objection, form.      19:55:31
3      THE WITNESS:  I do not.      19:55:33
4  BY MR. KRUEGER:      19:55:33
5      Q.   Do you know whether or not he has      19:55:34
6  manifested his intent with respect to the claim   19:55:35
7  that the third-party defendants committed fraud?  19:55:39
8      MR. MEYER:  Objection, form.      19:55:43
9      THE WITNESS:  I don't recall.      19:55:44
10  BY MR. KRUEGER:      19:55:44
11      Q.   If I were to tell you that Lou      19:55:45
12  Scheiner is one of the two people that owns the   19:55:47
13  plaintiffs' SNF's, would that refresh your      19:55:49
14  recollection as to who he is?      19:55:51
15      A.   No.      19:55:53
16      Q.   Did you read in Bob Homchick's report   19:56:03
17  that one of the things that he relied upon in     19:56:06
18  concluding there was no intent was the subsequent 19:56:09
19  conduct of the plaintiffs?  In other words,      19:56:14
20  conduct of the plaintiffs subsequent to the      19:56:16
21  closing?      19:56:18
22      A.   I don't specifically recall.      19:56:22
23      Q.   Are you aware that one of the things   19:56:26
24  that Bob Homchick relied upon was that      19:56:28
25  approximately ten months after the lawsuit was   19:56:32

## 311

K. McAnaney

1
2  filed and after Pete Licari and Mike D'Arcangelo   19:56:34
3  were charged in the Complaint with committing an  19:56:38
4  AKS violation, that Mike D'Arcangelo received a   19:56:42
5  phone call from Lou Scheiner and a gentleman      19:56:46
6  named Ron Ostroff, whose testimony you did not    19:56:48
7  read; correct?      19:56:51
8      A.   Correct.      19:56:51
9      Q.   Do you recall that portion of his      19:56:54
10  Mr. Homchick's expert report?      19:56:57
11      A.   Not particularly as I sit here.      19:57:00
12      Q.   Okay.  It might help refresh your      19:57:01
13  recollection that the report recounts a      19:57:04
14  conversation that Mr. Scheiner and Mr. Ostroff    19:57:08
15  had with Mike D'Arcangelo, where ten months after 19:57:12
16  the filing of the lawsuit, they called up Mike    19:57:16
17  D'Arcangelo and sought his participation as a     19:57:18
18  co-venturer or a manager of a 35 million-dollar   19:57:23
19  asset in Pennsylvania.      19:57:26
20      Does that refresh your recollection at   19:57:28
21  all?      19:57:29
22      A.   Yes.      19:57:29
23      Q.   Okay.  And do you recall that Lou      19:57:30
24  Scheiner testified that he would not have asked   19:57:33
25  Mike D'Arcangelo to manage a 35 million-dollar    19:57:37

## 312

K. McAnaney

1
2  asset or co-own it if he had any concern that     19:57:41
3  Mike violated the AKS?      19:57:45
4      MR. MEYER:  Objection, form.      19:57:47
5      THE WITNESS:  I don't recall that      19:57:49
6  specifically.      19:57:50
7  BY MR. KRUEGER:      19:57:50
8      Q.   Without regard whether or not you     19:57:52
9  recall it, does the fact that Lou Scheiner, one   19:57:54
10  of the principals of the plaintiffs, does not     19:57:56
11  believe that Mike D'Arcangelo committed any kind  19:57:58
12  of fraud?  Does that bear on your opinions at     19:58:02
13  all?      19:58:04
14      MR. MEYER:  Objection, form.      19:58:05
15      THE WITNESS:  Not with respect to      19:58:06
16  the anti-kickback violation that occurred      19:58:07
17  before.      19:58:10
18  BY MR. KRUEGER:      19:58:11
19      Q.   Well, the fact that ten months after  19:58:12
20  filing a lawsuit claiming there was a violation,  19:58:14
21  that he called up somebody and said, I want to do 19:58:18
22  a joint venture with you; and that he since      19:58:21
23  testified that he would not have made that phone  19:58:25
24  call if he thought that person had committed a    19:58:27
25  fraud, does that bear on your opinions at all?    19:58:29

## 313

K. McAnaney

1
2      MR. MEYER:  Objection, form.      19:58:31
3      THE WITNESS:  No, I don't think      19:58:32
4  his -- what his view is at this point in      19:58:34
5  time affects whether a crime was committed      19:58:37
6  once before.      19:58:43
7  BY MR. KRUEGER:      19:58:44
8      Q.   Even though he takes the position and  19:58:44
9  states that he does not believe that Mike      19:58:47
10  D'Arcangelo committed any kind of fraud, not just 19:58:49
11  an AKS, but any kind of fraud --      19:58:52
12      MR. MEYER:  Objection, form.      19:58:54
13  BY MR. KRUEGER:      19:58:55
14      Q.   -- that does not bear on your opinion? 19:58:55
15      MR. MEYER:  Objection, form.      19:58:57
16      THE WITNESS:  No, it does not bear      19:58:58
17  on my opinion as to whether there was a      19:58:59
18  violation here.      19:59:01
19  BY MR. KRUEGER:      19:59:02
20      Q.   So the fact that your own client      19:59:02
21  disagrees with you does not cause you to -- does  19:59:05
22  not cause you in any way to re-think your      19:59:09
23  opinion?      19:59:12
24      MR. MEYER:  Objection.      19:59:13
25      THE WITNESS:  No, it does not.      19:59:13

79  (Pages 310 to 313)